**Scott J. McKNIGHT, Respondent,**

v.

**MIDWEST EYE INSTITUTE OF KANSAS CITY, INC., Appellant.**

**No. WD 42375.**

Missouri Court of Appeals, Western District.

Oct. 30, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 4, 1990.

Application to Transfer Denied Jan. 9, 1991.

Michael P. O'Keefe, North Kansas City, for appellant.

Thomas E. Hankins, Gladstone, for respondent.

Before SHANGLER, P.J., and CLARK and BERREY, JJ.

SHANGLER, Presiding Judge.

The plaintiff McKnight, an ophthalmologist, engaged his professional services to the defendant Midwest Eye Institute of Kansas City. The original contract for year 1987 contained a restrictive covenant that at the termination of the term of employment McKnight would not practice medicine within a defined area for a period of three years. A new agreement concluded between them for year 1988 imposed the same restriction. McKnight and Midwest undertook negotiations for yet another employment term for year 1989. That proposal, however, contained a restrictive covenant more expansive in territory, and without a termination date. In the course of negotiations, it became evident that a new agreement was unlikely before the current one expired. One impediment to contract was the insistence by Dr. Hagan, Midwest director and principal, that McKnight agree to purchase Midwest stock by payment of $3 million over time, but with the voting rights retained by Hagan for twenty years. It was made clear to McKnight that Midwest intended to enforce the restrictive covenant should agreement on a new contract fail. Midwest draws the preponder-

ance of its patient base from Clay and Platte Counties. McKnight practiced in Clay County during the stint with Midwest, and continues to practice in that locale.

The negotiations at impasse, Midwest invoked the restrictive covenant before the termination of the current contract on June 30, 1989. Midwest proceeded to notify all hospitals and patients which McKnight served that he would be leaving the Kansas City area at the expiration of the contract term. Midwest also terminated his on-call duties, prohibited the treatment and consultation of patients, canceled surgeries McKnight was scheduled to perform, refused him any others, and locked his office. Midwest in effect consigned McKnight to a compulsory vacation for the rest of the contract term.

McKnight thereupon brought a petition to enjoin Midwest from the enforcement of the restrictive covenant of the employment contract, and for a declaration that the covenant was null and void as overbroad and otherwise contrary to public policy. Midwest, in turn, counterclaimed to enjoin McKnight from the breach of the restrictive covenant and the consequence of irreparable injury and, separately, for damages for breach of contract.

The trial court adjudged that the covenant not to compete was reasonable, but determined that the actions by Midwest informing hospitals and patients and physicians that McKnight was no longer practicing in the area, prohibiting his access to patients for treatment or surgery and other performance of medical duty—all before the termination of the contract term—prevented McKnight from the exercise of his profession when he was entitled to that practice and so constituted a material breach of the agreement. It was an adjudgment, implicitly, that the validity in law of the restrictive covenant notwithstanding, the conduct of the defendant in breach of the constitutive agreement foreclosed to Midwest the equity of injunction to enforce the noncompetition provision.

Accordingly, the court sustained the petition of plaintiff McKnight to enjoin Midwest from enforcement of the restrictive covenant of the employment contract with Midwest and denied any relief on the counterclaim. The defendant Midwest appealed from that judgment.

Midwest accepts the declaration of the trial court that the restrictive covenant was a valid contractual obligation, reasonable in scope, geography and time, and not otherwise violative of public policy. Midwest contends however that the refusal of the trial court to enforce the restrictive covenant on the ground that the termination of McKnight's services before the expiration of the employment contract constituted a material breach of the agreement was not only contrary to the weight of the evidence, but also erroneous as a matter of legal principle. Midwest argues that the prerogative of the management to idle McKnight or otherwise direct his employment service during the last month of the contract term was a provision explicit in the employment agreement, and thus could not have constituted a breach.

Midwest finds that prerogative in the contract term:

*Employment.* Effective from and after July 1, 1988, through June 30, 1989, the Doctor shall faithfully serve the Corporation in the regular ordinary course of the business of the Corporation in such capacity and perform such duties as the executive officers of the Corporation shall determine and direct from time to time.

It is the argument that this provision embodies the business judgment doctrine: that the business judgment of a corporation vests in the directors and shareholders wide latitude for its exercise in the conduct of the affairs of a corporation, an exercise with which courts will not usually interfere.[1] Accordingly [the argument goes], the judgment of the trial court that Midwest's redirection of McKnight's profes-

---

**1.** The argument cites *Herbik v. Rand,* 732 S.W.2d 232 (Mo.App.1987).

sional activity during the last month of the employment was a breach of agreement not only misconstrues the contract, but also unduly subjects management decision to judicial oversight, contrary to the business judgment rule.

 The contention intermixes two disparate principles of powers and liabilities. The business judgment rule protects the directors and officers of a corporation from liability for *intra vires* decisions within their authority made in good faith, uninfluenced by any other consideration than the honest belief that the action subserves the best interests of the corporation. *Herbik v. Rand*, 732 S.W.2d 232, 234[2–4] (Mo. App.1987); 19 C.J.S. *Corporations* § 482 (1990). It makes immune from court interference such an exercise of independent discretion. H. Henn, Law of Corporations § 242 (2d ed. 1970). The business judgment rule, however, does not operate to relieve a corporation of an obligation of contract merely because the managers hold the honest and disinterested belief that the action benefits the corporation. A corporation, no less than a natural person, is bound by a contract entered with proper authority, and no less than a natural person, may not repudiate the undertaking. *Wynn v. McMahon Ford Co.*, 414 S.W.2d 330, 336[7–11] (Mo.App.1967); 14 W. Fletcher, Cyclopedia of the Law of Private Corporations § 2564 (rev. perm. ed. 1989). These principles apply with equal effect to a corporation employment contract. *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 303[1–3] (Mo.App.1980).

 The obligation to perform under a contract is measured by the intention of the parties as gathered from the terms as a whole, and not from a solitary provision— as Midwest proposes. *Village of Cairo v. Bodine Contracting Co.*, 685 S.W.2d 253, 264[20, 21] (Mo.App.1985). It is an intention, moreover, that manifests from the object, nature and purpose of agreement, as well. *Wilshire Constr. Co. v. Union Elec. Co.*, 463 S.W.2d 903, 906[3] (Mo.1971).

 Midwest argues nevertheless that, if not validated as a business judgment, then the decisions not to schedule McKnight to work after June 1 until the end of the contract term on June 30, 1989— either as "on call" or by cancellations of surgery and other patient care—but to place him on vacation during that interim— and to change the office locks and inform patients and hospitals that McKnight's services would not be provided after June 2, were all performances sanctioned by the contract. It is an argument that the *Employment* provision [already cited] granted the employer Midwest the unqualified right to determine the hours of employee work, the location of the services and the professional duties to be performed. It is an argument, in effect, that the contract allowed Midwest to use or not use McKnight's services "as it s[aw] fit", provided Midwest discharged the salary obligation imposed upon it. It is an argument, once again, that the "best interests" of the corporate employer were paramount—in this case, interests served "by idling its employee, even though paying his salary, regardless of whether called 'vacation' or by some other name." This exercise of rights, bargained to the employer by the employee in exchange for the contract emoluments [the argument concludes], could not constitute a breach of contract.

The concomitant of the emoluments under the contract, however, were the medical services—particularly the highly specialized eye surgeries—performed by the employee as scheduled by Midwest. The basic compensation due McKnight under the agreement was $9,583.33 per month. There was also a separate provision termed *additional compensation*—spoken of in the testimony as a "production incentive bonus." It entitled the employee to fifty percent of total net fees in excess of $400,-000 collected by the corporation for the employee services to patients during the year July 1, 1988 to June 30, 1989. Midwest canceled five eye surgeries scheduled for McKnight for the month of June, 1989 and refused to schedule some twenty-five others, although they were medically necessary. McKnight had generated to Mid-

west net collections of $546,691.25 by May 30, 1989, or an average of some $50,000 per month during the contract term.

It is evident that the idling of Dr. McKnight for the month of June effectively deprived the employee of performance under the contract and the additional $25,000 compensation that would yield. It was a consequence readily acknowledged by Dr. John Hagan, corporation principal and director:

> Q. Now, did your prohibiting him from doing all these things, and I won't name it again and again, but one more time, not taking call, not being in the office, not performing surgery, and generally not seeing patients, did your decision not to allow him to do these things in June of 1989, have any impact on the gross revenues of Midwest Eye Institute?
>
> A. Yes.
>
> Q. And by that, I assume it had an adverse impact in that it lowered the gross revenues of Midwest Eye Institute?
>
> A. Yes.
>
> Q. Did your decision not to allow Doctor McKnight to do these things have an adverse impact on Dr. McKnight's entitlement to monies from Midwest Eye Institute?
>
> A. Discounting the vacation issue, yes.
>
> Q. And that is, if I understand the additional compensation provision, Doctor McKnight was entitled to fifty percent of all gross revenues that he generated after he hit Four Hundred Thousand; is that right?
>
> A. Yes.
>
> Q. And during the month of June, it all would have been in excess of Four Hundred Thousand; is that true?
>
> A. Yes.

The idling of Dr. McKnight from the practice of medicine for the month of June resulted in the loss to him of still other employment compensation. There was a provision for deferred compensation that upon termination of the employment for any reason, Midwest was to pay McKnight from the accounts receivable created by his services a sum determined by the formula:

| Age of Account (from date of billing) | % of face amount to be included |
|---|---|
| 30 days or less | 100% |
| 30 to 60 days | 75% |
| 60 to 90 days | 50% |
| 90 to 120 days | 30% |
| 120 days or more | 0% |

The sum determined by the formula was then reduced by 15% [to discount the cost of collection] and the remainder paid to the employee. The refusal by Midwest to allow McKnight to practice services for the month of June, therefore, not only reduced the amount otherwise earned by the employee as additional income under the usual functioning of the employment agreement, but also virtually precluded to McKnight the normal value of the accounts receivable as deferred compensation at the termination of employment.

The trial court found that the June vacation enforced upon Dr. McKnight and the refusal by Midwest to allow him to practice medicine constituted material breaches of the employment contract. We agree. To consign all of the meaning and purpose of the contract [as does Midwest] to the *Employment* provision excerpt that McKnight shall faithfully serve the corporation "in such capacity and perform such duties" as the management may direct is to unduly truncate the mutual rights and obligations the undertaking intends. *Village of Cairo v. Bodine Contracting Co.*, 685 S.W.2d at 264[20,21]. It not only deprives the other provisions of function or sense, but also slights the duty of good faith and fair dealing our law imposes upon the parties of contract. *Morton v. Hearst Corp.*, 779 S.W.2d 268, 273[12, 13] (Mo.App.1989); Restatement (Second) of Contracts § 205 (1981).

It is a duty of one party to a contract to cooperate with the other to enable performance and achievement of the expected benefits. *Martin v. Prier Brass*

*Mfg. Co.*, 710 S.W.2d 466, 473[9–10] (Mo. App.1986).

There is no basis in the text or function of the contract terms for the prerogative Midwest claims to compel an employee to a vacation. *Vacation and sick leave* are the subjects of a separate provision. It entitles the employee to "four (4) weeks for vacation and continuing education time at periods *mutually agreeable* to Doctor and The Corporation." [emphasis added] There was, moreover, abundant evidence that McKnight had already used the allowance for that contract year. A *call schedule* for the employee is also the subject of a separate provision. It requires the doctor to be on call sixty percent of the weeks. That duty, as are the other medical performances under the contract, is rendered for a fee, and so contributes to the earnings of the employee.

There is no contract text or other source of intention for the prerogative Midwest claims, to idle Dr. McKnight from the performance of services before the end of the employment term only because they could not agree on a renewal. The essential exchange of performances, the very *quid pro quo* for contract, was the rendition of medical services by the employee for compensation by the employer. The conduct of the employer that denied any employment function to the employee after June 2 effectively terminated that exchange of performances while the contract yet subsisted. The conduct constituted a unilateral breach of contract.

The trial court found that the breach was material, and sustained the petition by the employee McKnight to enjoin the employer Midwest from enforcement of the restrictive covenant provision of the employment contract. The court, concomitantly, refused the counterclaims of the employer for damages for breach of contract and injunction against the employee McKnight for threatened breach of the restrictive covenant. The judgment gave effect to the principle that a material failure by one party to give performance gives the other party the right to repudiate the contract. *Boten v. Brecklein*, 452 S.W.2d 86, 92[1–8] (Mo.1970); Restatement (Second) of Contracts § 225(2) (1981). It gave effect also to the cognate principle that a party who is the first to violate the contract by failure to give material performance may not claim its benefit. *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327, 331[7–12] (Mo.App.1954). That expresses the rule that where, as here, the mutual performances are exchange of promises, each contractor is entitled to the assurance that the remaining duty to perform the promises will not be expected where the other contractor has already caused an uncured failure of performance. Restatement (Second) of Contracts § 237 comment b (1981).

The materiality of a breach is usually a question of fact. J. Calamari & J. Perillo, The Law of Contracts § 11–22 (3d ed. 1987). Among the significant circumstances that guide the finder of fact in that determination are: (1) the extent to which the injured party will be deprived of a reasonably expected benefit, (2) the extent to which the injured party can be compensated for the part of that deprived benefit, (3) the extent to which the party failing to perform will suffer forfeiture, (4) the likelihood that the party failing to perform will cure that failure, and (5) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing. Restatement (Second) of Contracts § 241 (1981); *Stokes v. Enmark Collaborative*, 634 S.W.2d 571, 573[1–4] (Mo.App.1982).

The redress sought by McKnight for the breach of performance by Midwest was not damages, but relief against the enforcement of the restrictive provision of the contract. Circumstances (1) and (2) [described as (a) and (b) of Restatement § 241] which relate to the compensation benefit due the injured employee, therefore, do not impinge immediately on the determination of material breach. It is enough to say that the deprivation to McKnight of the reasonably expected monetary benefit for

one month of employment was readily calculable as damages, and so would not have been lost to him. The rendition of employment service, however, was not the only promise that McKnight was obliged to make for the expected compensation benefit. He also agreed not to compete with the employer at the conclusion of the contract term. The *de facto* discharge by Midwest at least a month before the end of the term left McKnight without employment under the contract or the right to other employment within the environs under the restrictive covenant provision of the employment contract.[2]

That unilateral and unjustified breach, unless material as the trial court found, does not impair the obligation of the employee or the benefit to the employer under the restrictive covenant provision. *Forms Mfg., Inc. v. Edwards*, 705 S.W.2d 67, 69[1] (Mo.App.1985); *Blythe v. Blythe*, 586 S.W.2d 393, 396[4] (Mo.App.1979). In the assessment of material breach, usual considerations, among the others, are the extent to which the party who fails to perform will suffer forfeiture and the likelihood that such party will cure the failure. Restatement (Second) of Contracts § 241(c) & (d) (1981). On principle, therefore, a failure to perform that occurs early is less likely to be treated as material than one that occurs late, after substantial performance. This principle, however, depends upon the fairness of the consequences of its application to the circumstances of contract. J. Calamari & J. Perillo, The Law of Contracts § 11–22 (3d ed. 1987); Restatement (Second) of Contracts § 241 comment d (1981).

In very effect, the question the determination of materiality of breach poses does not arise from the agreement of the parties, but as a matter of fairness. That is the object of the calculus that Restatement § 241 addresses to the issue. That is preeminently also the object of subsection (e)

of that calculus. The finding by the trial court that the failure of Midwest to perform was a material breach and the judgment that denied injunctive relief determined that the conduct of the employer was without sufficient equity to sustain a claim to enforce the restrictive covenant. It was also an implicit determination that the failure to perform and to cure the failure to perform were marked by an absence of good faith and fair dealing.

That finding and determination rest on substantial evidence. They derive from proof that the decision to idle the employee rested on McKnight's refusal to accept the stock purchase as a condition for renewal of the employment term. They derive from the abrupt cancellation of surgeries already scheduled by Midwest for performance by Dr. McKnight during June and the refusal to schedule many others during that month, although medically necessary by their usual standards. It is no answer, as Midwest attempts, that the employee received the base pay for that month. The obligation of the employer under the contract, in good faith and fair dealing, was to cooperate with the employee to bring about the reasonable expectation of benefits by the optimum use of his skills. *Morton v. Hearst Corp.*, 779 S.W.2d at 273[12,13]. That contract expectation included additional compensation from surgeries and other medical services.

The finding by the trial court, also implicit, that the promise by the employer to continue the employment of the employee for the full contract term was a material part of the agreed exchange rests on substantial evidence. To suffer from that failure of performance not only the curtailed employment, but also from the continuing obligation not to compete, are detriments not reasonably expected by the employee to flow from the employer's breach of contract. We affirm the determination of the trial court that the breach by Midwest was

**2.** A temporary restraining order issued on June 14, 1989, mid-way into the last month of the contract term, meliorated the contract restriction pendente lite to allow McKnight some practice outside of the area from which Midwest derived most of its patients.

material and prevents the duty of McKnight under the restrictive covenant from becoming due.

■■■■ An agreement between physicians not to compete after withdrawal from the enterprise will usually be enforced in equity for want of adequate remedy at law for its breach. *Willman v. Beheler*, 499 S.W.2d 770, 777[17–19] (Mo.1973). A medical employer, however, may act so unreasonably in the assertion of the right to terminate the employment as to incur the refusal of a court of equity to enforce a provision for the benefit of such a party. A suit in equity to enforce a restrictive covenant partakes of a petition for specific performance. Such a redress is not a matter of right, but of discretion. A court of equity will not aid a party who resorts to unjust and unfair conduct. *Showe–Time Video Rentals, Inc. v. Douglas*, 727 S.W.2d 426, 430 (Mo.App.1987). We affirm the determination of the trial court that the breach by Midwest was material and prevents the duty of McKnight under the restrictive covenant from becoming due.

Midwest argues nevertheless that since the patients seen by McKnight were patients of the corporate employer and not of the employee, and because of the employer's "exclusive common law and contractual right" to determine the capacity, scheduling and duties the employee was to undertake, "medical/ethical-legal considerations mandated that such absolute authority be exercised to prevent [McKnight] from undertaking any surgical or patient care activities in June, 1989." It is an argument, in effect, that implications of medical ethics and legal liability that attended the assignment of surgeries to a physician who would not be available to give post-operative care because of the impending termi-

nation of the employment relationship and the operation of the restrictive covenant thereafter justified the corporation decision to deny his rendition of services.

We have already determined that there is no contract text or other source of intention for the "absolute authority" to abruptly deny to the employee the right to perform medical services otherwise routinely assigned only because there remained only one more month of employment. The "absolute common law right" Midwest asserts to that end is but a euphemism for the business judgment rule.[3] That is evident by the recurrent citation to *Herbik v. Rand*, 732 S.W.2d 232 (Mo.App.1987) and *Wolgin v. Simon*, 722 F.2d 389 (8th Cir. 1983). It is another resort to the notion that, under that principle, the idling of the employee was legally justified because it subserved the best interests of the corporation by guarding against potential liability. We have already determined also, however, that the business judgment rule does not operate to relieve a corporation of an obligation of contract, even though the managers believe that their actions are better for the corporation.

What remains is the appeal to ethics. Both the employer and the employee requested and obtained advisory opinions on the ethical implications of the non-renewal of the contract as it impinged on the obligation of patient care. Midwest also presented Dr. Kart Ludvigsen, expert in medical ethics. He responded to cross-examination with the opinion that, contractual rights aside, it would be unethical for one doctor to prohibit another doctor, who is willing and able and "is on staff and can render treatment at those hospitals", from seeing patients. He gave another opinion that, legal questions aside, it would be

---

**3.** This phase of the argument introduces into the discussion contract provision *Policy Decisions:* [T]he Corporation shall have the sole and exclusive right of management over the medical practice, including, without limitation, the determination of the professional standards to be observed, the determination of fees to be charged patients for services rendered in the practice, and the office hours to be maintained, said decisions to be taken by majority vote pursuant to the By–Laws of the Corporation.

It is a provision our opinion considers in the context of the numerous others in the formulation of our judgment.

"most ethical" for a physician who performed the surgery in May to render the post-operative care in June. He agreed also that, ethically, "June surgeries can still be done by a doctor who is leaving on June 30th as long as the patient is advised of it, and as long as the patient and the physician made arrangements for appropriate post-op care." The evidence, even if otherwise legitimate as proof of legal obligation of performance under the contract, does not sustain the Midwest contention that the decision to idle McKnight during June was justified by the medical ethics of patient care.

The ethics argument is, in any event, self-defeating. The contract between Midwest and McKnight was for one year. McKnight had the right to terminate the contract at the end of the year term, but not before. Midwest had the right to terminate the employment for any reason upon ninety days notice, and for cause upon ten days notice. There was evidence that the eye conditions that Dr. McKnight treated by laser and other surgery sometimes required not only repeated procedures, but also extended post-operative care. In circumstances where the employment may not exceed even the period needed for complete care, to adopt the premise that Midwest proposes would be to supplant opinions on medical ethics for the contract terms as the basis for the obligation to perform. The more satisfactory accommodation to any ethical concerns for patient care, rather, is to provide for the contingency of non-renewal by contract provisions that address them.

◼ Midwest argues also that the contract was severable so that the refusal of the court to give effect to the restrictive covenant because of the material breach of contract was error. The term to which the argument alludes declares that if a provision is held invalid or voided, the remaining provisions shall nevertheless continue in full force and effect. The concept of divisibility is employed in two contexts. The first—and most compatible with the terminology before us—relates to the enforcement of one part of an agreement even though another part is unenforceable on grounds of public policy. Restatement (Second) of Contracts § 183, comment a (1981). The second—and most usual—relates to whether a party in default under one part of the contract may nevertheless recover under another part. J. Calamari & J. Perillo, The Law of Contracts § 11–28 (3d ed. 1987). The application of concept Midwest argues for is of the latter kind. In either case, the question of severability is largely one of the intent of the parties. *Dippel v. Rokwell Indus., Inc.*, 715 S.W.2d 553, 555[2] (Mo.App.1986). Whether or not a contract is severable depends upon "whether the undertakings are separate and independent or, whether even if they are divisible they are part of the same exchange." J. Calamari & J. Perillo, The Law of Contracts § 11–27 (3d ed. 1987). We have already determined that, in the circumstances, the good faith performance by Midwest of the obligations of the employment contract was the exchange expected by McKnight for its performance of medical services during the term of employment and observance of the restrictive covenant thereafter. They were part of the same exchange and not divisible so that the material breach by Midwest excused McKnight from any further performance under the contract. We have determined also that, in any event, under the evidence the court of equity was justified in the refusal to give effect to the covenant not to compete.

◼ Finally, the employee McKnight argues that restrictive covenants against physicians are void as against public policy and that the trial court erred in holding that the restrictive covenant in the employment agreement was valid, even though not enforceable under the evidence. It is to be noted that McKnight is the respondent to the appeal, and not a cross-appellant. The prayer for relief sought an injunction against the enforcment of the restrictive covenant against McKnight and

also a declaration that the restriction was "null and void and unenforceable." The judgment of the court enjoined the enforcement of the restrictive covenant, and although not accompanied by a declaration of its invalidity, found the restriction unenforceable, and so effectively granted all the relief sought. It is evident that McKnight did not suffer any infringement of legal right and so was not *aggrieved* by the judgment to have standing to a cross-appeal. *Government Employees Ins. Co. v. Clenny,* 752 S.W.2d 66, 68[2–4] (Mo.App. 1988); § 512.020, RSMo 1986; Rule 81.-04(a) & (b).

■ A respondent who does not cross-appeal may nevertheless defend the favorable judgment with any argument that is supported by the record, whether ignored by the trial court or simply rejected. *See* 9 J. Moore, B. Ward, J. Lucas, Moore's Federal Practice para. 204.11[3] (2d ed. 1990) (discussion of Fed.R.App.P. 4(a)(3), counterpart to our Rule 81.04(a)). The most perfect statement of this principle was rendered by Justice Brandeis in *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924):

> [A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the [respondent] may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the [respondent] may, without taking cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.

■ The argument of the respondent that the judgment entered was erroneous for failure to declare the restrictive covenant void seeks to lessen the rights of the adversary, and so required a cross-appeal to present it for our decision. The argument is denied.

The judgment is affirmed.

All concur.