HEALTH RELATED SERVICES,
INC., Respondent,

v.

GOLDEN PLAINS CONVALESCENT
CENTER, INC., Appellant.

No. WD 42543.

Missouri Court of Appeals,
Western District.

March 26, 1991.

Benjamin F. Mann and Douglas J. Schmidt, Kansas City, for appellant.

Duane J. Fox and Paul G. Schepers, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

Health Related Service, Inc. [HRS] sued Golden Plains Convalescent Center, Inc. [Golden Plains] for the breach of a management contract by refusing to allow HRS to make the agreed performance. Golden Plains alleged that HRS breached the contract by failing to make the agreed performance and counterclaimed for damages. The jury found in favor of the claim of HRS and against the counterclaim of Golden Plains, and assessed damages of $170.647.12. Golden Plains appeals the judgment entered upon the verdict in favor of HRS.

HRS contracted to manage Golden Plains, a skilled nursing home in Kansas, for a term of ten years. There was included an option to either party to renew the contract for two successive ten year terms. HRS was to receive the greater of 5% of the gross revenues of the nursing home or $750 per month. In exchange, HRS agreed to operate and manage the facility. Those services included the supervision of the nursing home, the recruitment and training of personnel, establishment of fiscal policies and rates for patient care, purchase of supplies, the supervision of dietary and food preparation, advice as to insurance coverages, and other such incidents of operation.

The contract took effect in January of 1977. HRS was acquired by Research Health Services, Inc. in October of 1981. Following that acquisition Golden Plains began to experience dissatisfactions with the HRS management of the facility. They included the failure to pay vendor invoices

on time, to supply payroll checks and to adequately staff the operation, among other neglects. Golden Plains informed HRS of these lapses in the obligation to perform, and on December 17, 1982, formally terminated the contract.

HRS followed with this suit and alleged that the termination constituted a breach of the contract. The petition sought as damages the lost profits from the remainder of the ten year term as well as the two ten-year option terms. The Golden Plains counterclaim alleged that the numerous failures by HRS to make performance effectively terminated the contract and sought damages for that default.

Golden Plains sold most of its assets in October of 1984 and left the nursing home business. At that time also the number of homes HRS managed was in decline. In November of 1984 HRS decided no longer to manage nursing homes. In January of 1987 the last of the HRS nursing home management contracts was terminated. There was evidence that thereafter HRS continued as a shell corporation without business activity. There was evidence also that at the time the contract was terminated and thereafter, HRS had access to the full resources of its parent, Research Health Services—a system of some 32 corporations—so that had not Golden Plains terminated that management contract, HRS would have been fully capable of performing the required services.

We note at the outset of the discussion of the legal issues the agreement of the parties that the substantive law of Kansas governs their dispute.

## I. Submissibility of the HRS Claim

■ Golden Plains asserts first that the trial court erroneously denied its motion for judgment notwithstanding the verdict because HRS failed to prove a submissible breach of contract. In order to prove a case under the theory Golden Plains propounds, HRS "had to show that it properly performed *all* of its duties under the contract rendering the performance by Golden Plains necessary." [emphasis added] It is the sense of the argument that, in the absence of evidence that there was "satisfactory performance" of all the obligations owed by HRS, "Golden Plains had just cause to terminate the contract."

This argument undertakes to correlate two deemed principles of contract law. One is, that the strict and literal performance of the terms of the contract is the condition precedent to recovery on the contract. The other is, that the failure to make exact performance constitutes a material breach and entitles the other party to repudiate the contract and treat the obligation for further performance as rescinded. One invokes a rule in general discard, and the other an application of a rule incompatible with the law as now evolved. The common law rule that required exact performance of the contract has given way to the modern view that allows recovery for substantial performance done in good faith. That is the principle that obtains in general, and the principle that governs contract disputes under Kansas law. 17A C.J.S. *Contracts* § 508 (1963); 17A Am. Jur.2d *Contracts* § 631 (1991); *Holder v. Kansas Steel Built*, 224 Kan. 406, 582 P.2d 244, 250[7] (1978).

■ A cause of action for the contract price is proven by evidence that the plaintiff has in good faith made substantial performance of benefit to the other party, a benefit retained—subject nevertheless to the right of the other party for recoupment of damages for the imperfect performance. *Id.*; 17A C.J.S. *Contracts* § 508 (1963). The doctrine of substantial performance expresses the presumption that the exchange contractors expect from each other is that of a reasonable performance. Restatement (Second) of Contracts § 241 comment b (1981). Thus, the doctrine operates when the defects in performance are sufficiently slight that damages will complete the contract. 17A Am.Jur.2d *Contracts* § 632 (1991). A material defect or failure in performance, however, is not a reasonably expected performance, and so operates to prevent the duty of the other party to perform from becoming due. *McKnight v. Midwest Eye Inst.*, 799 S.W.2d 909, 915 (Mo.App. 1990); Restatement (Second) of Contracts

§ 237 comment a (1979). The effect of the Golden Plains argument is that the failure of HRS to perform the contract was material, and so precluded HRS from a theory of substantial performance, and excused Golden Plains from any further obligation to perform. The specific lapses of performance are not described, other than as allegations in the Golden Plains counterclaim. The brief merely alludes to 27 pages in the transcript cross-examination of HRS vice-president Fischer as proof that "Golden Plains was dissatisfied with HRS' services and had repeatedly voiced its dissatisfaction." It is apparent from that testimony, from the exchange of correspondence, and the testimony of Golden Plains employees, that in 1981 Golden Plains acquired a new administrator and HRS was acquired by Research Health Services. It was a period of readjustment of the systems of operation between them and also of complaints.

The dissatisfactions—some of them petty, others of more consequence—ranged from the shortage of linens to late payment of invoices, late payrolls and the failure to obtain medicare reimbursements due, among others. There was evidence that HRS was responsive to these complaints and disposed to correct them. There was other evidence that some were never fully resolved to Golden Plains' satisfaction. It is this residue of dissatisfaction, Golden Plains seems to insist, that proves not only that HRS failed to perform under the contract, but also a fundamental breach that both denies HRS any right to recover and justifies Golden Plains to terminate the contract.

■ It is not every dissatisfaction with a contract performance, nor even every breach—but only a material breach—that excuses performance by the other party. *See McKnight v. Midwest Eye Inst.*, 799 S.W.2d at 915 and *Village of Cairo v. Bodine Contracting Co.*, 685 S.W.2d 253, 260[9–11] (Mo.App.1985). The circumstances significant to that determination are given in Restatement (Second) of Contracts § 241 (1981). They are explained and applied in *McKnight v. Midwest Eye*

*Inst.*, 799 S.W.2d at 915[9–11]. It is sufficient to say that, under those principles, neither the evidence nor the arguments Golden Plains brings to bear, shows any HRS neglect that constitutes a material failure to perform under the contract. Those considerations that determine whether performance is substantial are those that determine whether a failure is material. Restatement (Second) of Contracts § 237 comment d (1979). It follows that HRS proved a submissible case of breach of contract.

## II. Submissibility of Damages

■ Golden Plains argues also that, the cause was not submissible in any event, because the claim for lost profits, the only damages sought by HRS, was not proven. The argument cites Kansas authority to the effect that loss of profits as an element of damages for contract breach are recoverable when "proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties." *Vickers v. Wichita State Univ.*, 213 Kan. 614, 518 P.2d 512, 515 (1974). *Vickers*, the leading exponent in Kansas on loss of profits, also holds, "The fact that damages cannot be calculated with absolute exactness will not render them so uncertain as to preclude assessment." *Id.* at 516[3].

Golden Plains contends that the HRS evidence of damage calculations, based not only on the four years that remained on the contract, but also on the two successive ten-year options, was wholly speculative. The HRS testimony that they would have exercised the options to renew, moreover, was contradictory, Golden Plains asserts, and not trustworthy. In any event, the argument goes, that evidence "cannot overcome" the fact that HRS voluntarily chose to leave the business of nursing home management in 1984, before the first option to renew ever accrued. It was "sheer speculation," Golden Plains argues, to conclude that HRS would have renewed the contract with Golden Plains when HRS had already voluntarily terminated every other such contract.

The latter argument was refuted by the evidence that there were more than adequate resources available to HRS to perform the services for the duration of the contract term. Throughout 1982 HRS performed its contract obligations to Golden Plains through the employees and resources of its parent, Research Health Services. Moreover, even at the time of trial, Research Health Services was managing two nursing homes. The same staff and facilities remained fully available to HRS.

Golden Plains argues also that because HRS relinquished the nursing home management business, there was not sufficient evidence that HRS would exercise its options to continue to perform. Thus, the evidence of lost profits based upon the exercise of those options was speculative and inadmissible. The argument cites *Hole v. Unity Petroleum*, 15 Wash.2d 416, 131 P.2d 150 (1942) that in the "highly competitive and uncertain business" of gasoline distribution, their decision to exercise the option to extend the life of the contract would be governed by the conditions at the time the election was required. The evidence was, however, that HRS' income was not dependent upon the profitability of Golden Plains, since it was based on a percentage of gross income. There was evidence also that HRS enjoyed a long history of consistent profit from its contract with Golden Plains. There was detailed evidence to sustain that inference. The competency of such evidence to prove lost profits is confirmed by Kansas law. *Vickers* holds that anticipated profits may be allowed as damages upon a breach of contract "where the business undertaken is not new or untried, and has been established to such an extent that a safe basis can be found upon which to estimate such profits." *Vickers*, 518 P.2d at 517 (Quoting *Outcault Advertising Co. v. Citizens' Nat'l Bank of Emporia*, 118 Kan. 328, 234 P. 988, 989 (1925). A history of past profitability, *Vickers* concludes, establishes a loss of profits with reasonable certainty. That law governs on the evidence before the jury.

The damages of $170,647.12 awarded to HRS, moreover, are *less* than calculated by its evidence over the remaining term of the contract, the options excluded. On the basis of the testimony, the loss accrued to HRS through the expiration of the original contract term was $179,191. The jury returned less.

■ Golden Plains argues also that the calculation of lost profits was invalid because HRS neglected to deduct the percentage of the salaries of certain HRS management staff. There was evidence that those salaries were a fixed cost of personnel who serviced numerous other management contracts as well. That cost continued even after Golden Plains terminated its contract. As such, it was akin to overhead which remained unaffected by whether or not a particular contract was breached. It was a cost remote to the calculation of true damages. *Oakland Cal. Towel Co. v. Sivils*, 52 Cal.App.2d 517, 126 P.2d 651, 652 (1942). The expenses attributable to the lost Golden Plains business were fully taken into account to derive damages from the Golden Plains breach of contract.

### III. Instruction Error

The next Golden Plains point asserts that the refusal by the trial court of tendered general breach of bilateral contract verdict director, MAI 26.06, and the submission instead of HRS' substantial performance verdict director, MAI 26.07, was prejudicial error. The argument cites the *Caution* to Notes on Use (1980 New) to MAI 26.07: "This instruction is not proper in all contract cases. This instruction may be used only in cases where substantial performance is legally sufficient." The argument then cites the Committee's Comment (1980 New) that follows: "This instruction [MAI 26.07] would be appropriate where recovery is sought in a building contract." Golden Plains draws the conclusion from this commentary that substantial performance MAI 26.07 is for use in construction contracts only.

That contradicts not only the tenets of the general law of contracts, but also of the law of Kansas, which governs here. "While the doctrine of substantial perform-

ance is applied most frequently in building and construction contracts, it is not so limited and may be applied in the case of any kind of contractual obligation to perform." 17A Am.Jur.2d *Contracts* § 631 (1991). The official comment to PIK 18.10, the Kansas counterpart to MAI 26.07 on substantial performance, is a virtual rescript of that declaration of principle. It is an application of principle given by the Supreme Court of Kansas to bilateral contracts generally in *Holder v. Kansas Steel Built*, 224 Kan. 406, 582 P.2d 244 (1978).

■ It is not the contract prototype that bears upon whether the doctrine may apply, but the expected exchange of performances under the terms of the agreement and whether the nonperformance was in bad faith or a deliberate departure from the contract. Restatement (Second) of Contracts § 241 comments a & f (1979). Thus, if the terms of the agreement make full performance a condition, substantial performance does not suffice for relief under the contract. Restatement (Second) of Contracts § 237 comment d (1979). There was no such condition to the expected exchange of performance from Golden Plains. As already determined, the HRS conduct under the contract was free from material breach. Its performance, therefore, was substantial and properly submitted by MAI 26.07. *See* Restatement (Second) of Contracts § 237 comment d (1979).

HRS submitted damages under MAI 4.01, the general damage instruction. The Caution Notes on Use (1980 New) to MAI 26.07 advise, however: "Use MAI 4.08 as the damage instruction where substantial performance is submitted." That instruction directs the jury to reduce the damages awarded to the plaintiff by "any sum necessary to correct variations." The Notes on Use (1988 New) to MAI 4.08 advise: "This instruction is to be used only in cases involving contracts in which substantial performance is sufficient. See the verdict directing instruction MAI 26.07." Golden Plains argues that the advisories require that MAI 26.07 and MAI 4.08 "be used in tandem," and that noncompliance constituted error. *Hudson v. Carr*, 668 S.W.2d 68,

71[3] (Mo. banc 1984) advises: "Failure to follow MAI, including the Notes on Use, is error, with the prejudicial effect subject to judicial assessment."

■ A defendant who claims defective performance of a contract may elect to plead in defense the "variations" from the required performance to mitigate or extinguish the plaintiff's claim to the contract price, or may plead an affirmative counterclaim for damages. *Brush v. Miller*, 208 S.W.2d 816, 820[8, 9] (Mo.App.1948). To recoup its losses for the defective performance ["variations"], Golden Plains elected to counterclaim for a judgment for damages rather than merely to defend against the contract price. The verdict of the jury against the Golden Plains counterclaim adjudicated that Golden Plains was not damaged by any defective performance by HRS. The propriety of the judgment entered on the counterclaim was not raised on this appeal. In the circumstances, it would have been redundant and unfair to require HRS to submit the same issue as an element of its damages instruction. There was neither trial error nor prejudice to Golden Plains by the conjoined submissions of MAI 26.07 and MAI 4.01.

## IV. Admissibility of Evidence

### A. *Admission of Exhibit 39*

Exhibit 39 was the 1984 contract for the sale of Golden Plains to Dick Currie, the incorporator of a Kansas corporation to be formed. A term of that contract noted that Golden Plains was then a defendant in a case brought by HRS, and included the agreement of Dick Currie "to assume the defense of said case and to indemnify Golden for expenses and any judgment ultimately rendered." Among the witnesses who testified for Golden Plains were Marilyn Luman, administrator for Golden Plains and then for the successor Dick Currie corporation. At the time of her testimony Luman was also a director and 5% owner of that corporation. Vernon Huckins was also a witness for Golden Plains, who had retained him as an accounting expert for the purposes of the litigation with HRS. Huckins was also a vice-president and em-

ployee of the holding company owned by Currie. There was much in the testimony of Luman, and especially of Huckins, concerning HRS' failure to perform under the management contract with Golden Plains. Kumba, an original investor in Golden Plains, and its former president, also testified in its behalf.

Exhibit 39 was asserted to show the interest Luman had in protecting her own financial stake in the Currie corporation, and hence her interest in the outcome of the litigation in which she testified. The exhibit was *tendered and received* to show *Huckin's* interest in protecting his employer from loss. HRS cross-examined Huckins from this exhibit, but not Luman.

Golden Plains does not dispute that the interest and bias of a witness are always proper subjects of inquiry. *Thornton v. Vonallmon*, 456 S.W.2d 795, 798[1–4] (Mo. App.1970). Golden Plains objected to exhibit 39, and argues now, that since Luman was not confronted with the exhibit, its use constituted a "collateral" impeachment of the witness, and so was improper. Golden Plains objected also that the indemnification agreement was inflammatory and prejudicial because, like evidence of insurance, "it shows that the defendant has a source of payment of a judgment other than its own financial resources."

The record does not show that exhibit 39 was received for impeachment of Luman, by then an absent witness, or that the indemnification recitation was used or was disclosed to the jury for that purpose. The exhibit was received during the testimony of witness Huckins, and its use was expressly "to show interest and bias on the part of *this* witness." [emphasis supplied] That was the only impeaching use made of that evidence.

The assertion by HRS that the Currie indemnity was material to the litigation arose during the cross-examination testimony of Kumba. HRS proposed to question Kumba concerning the Curry indemnity to show *Luman's* interest in the outcome of the litigation. Luman had by then given her testimony and was dismissed. That purpose, however, was never disclosed to

the jury, since the objection and response of counsel were to the court. The court ruled that the Currie indemnity was relevant for the asserted purpose, and the proceedings returned to open court. It was then that counsel asked Kumba about the indemnity, but Kumba had not heard of it and could not answer. That ended the interrogation. Exhibit 39 was used neither then nor later to impeach Luman. It was formally tendered and received later, to impeach witness Huckins, and him alone.

 Golden Plains argues nevertheless that although the exhibit was received to show the bias and interest of the witness, it was used to argue to the jury that the counterclaim was not genuine, but merely a gesture of cooperation with Currie who agreed to assume the defense and indemnify Golden Plains for any judgment rendered. Golden Plains cites the rule that, other than to show bias and its effect on given testimony, an argument to the jury that a person not a party to the action would pay the judgment is reversible error. That rule, on very principle, is regularly applied in personal injury cases to prevent disclosure that a liability insurer is interested in the outcome of the case. *Murphy v. Graves*, 294 S.W.2d 29, 32[3] (Mo.1956). It is not every such incident, however, that constitutes reversible error. *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 787[5, 6] (Mo. banc 1977). It is when counsel acts with "adroit purpose" or in bad faith to impress the jury that someone other than the defendant would be responsible for the judgment that reversal is the expected sanction. *Murphy v. Graves*, 294 S.W.2d at 32; *Moss v. Nehman*, 247 S.W.2d 305, 306[1] (Mo.App.1952).

The indemnity component of Exhibit 39 included not only the Currie corporation agreement to assume the defense of the HRS litigation and to indemnify Golden Plains for any expense and judgment, but also the Golden Plains agreement to cooperate with Currie in the defense. That cooperation included "the filing of a counterclaim in the pending action or the filing of a new action against [HRS]." In closing argument, HRS counsel berated the Golden

Plains evidence of HRS' failure to perform—as it came from Huckins—as "silly defensive counterclaims" prompted by the interest of that witness in protecting his employer, the Currie corporation. The counterclaim was a "ploy," an "attempt to divert the issue" away from Golden Plains' own nonperformance. It was an argument that the want of merit notwithstanding, Huckins' bias in protecting the interest of his employer, Currie, extended beyond defending against the HRS claim to establishing the counterclaim, an obligation due from Golden Plains to the Currie company under the indemnity agreement. It was readily so understood by the jury. The closing argument used Exhibit 39 to the same effect for which it was admitted: to show the bias and interest of witness Huckins. There was no exploitation—beyond the literal indemnity terms of the exhibit—of the Currie company's undertaking to pay any judgment ultimately rendered against Golden Plains. There was neither error nor prejudice by the use of Exhibit 39 on closing argument.

B. *The Testimony of James Fischer*

James Fischer had been engaged in nursing home management and operations since 1972. In that course and since, Fischer has been responsible for the management of hundreds of such facilities. In mid–1982 he came to the HRS group as vice-president of all of its nursing home operations. He left at the end of 1983 and has since owned his own health care management business. Among his duties at HRS was to study and investigate the status of HRS' performance of its various nursing home contracts, including the management contract with Golden Plains.

Fischer testified to the HRS readiness to fully perform the management contract with Golden Plains, but that Kumba, its president, interfered. In addition to a narrative of HRS' performance during his presence, there were elicited from Fischer opinions whether HRS had the willingness and ability to perform the management ser-

vices through the contract term and the two ten year options, had personnel available to conduct a nursing home management business, and whether the occupancy rate at Golden Plains would have gone up had HRS continued to manage that home. Fisher responded with an affirmative opinion to each inquiry.

Golden Plains complains that these were predictions of future events without basis in fact, and so incompetent as expert opinion. Golden Plain argues that since the expert did not testify from firsthand knowledge to render the opinions, they could be properly derived only by hypothetical questions that assumed facts supported by evidence, and cites *Miller v. Weber*, 688 S.W.2d 389, 391 (Mo.App.1985).[1] The opinion that HRS had the capacity to service the Golden Plains contract even after termination and throughout the option terms was grounded in fact, and was probative. HRS, although then already a shell corporation, during 1982 used interchangeably the personnel and resources of the parent corporation. The parent continued to manage nursing homes with the same resources at the time of trial, in 1989, by then beyond the end of the first contract term of years. The other opinions were grounded on the experience of the witness in the industry, as well as empirical data, albeit not assumed as hypothetical fact. These opinions that HRS would have renewed the contract and options to manage Golden Plains and had the capacity to perform them, in any event, could not have prejudiced Golden Plains. The testimony of senior vice-president of the parent Research Management group Vonderfect to that effect was before the jury.

The actual cavil is at the calculations given by the witness as to lost profits as measured by the occupancy rate projected for Golden Plains during the balance of the contract term and through the two ten-year option periods. The damages returned by the jury were less than the amount claimed for the balance of the original contract, so that Golden Plains could not have been

1. That rigid rule of expert opinion evidence has since been meliorated by the enactment of

§ 490.065, RSMo Supp.1991 (effective date Aug. 28, 1989).

prejudiced by the opinion of lost profits beyond that term.

Golden Plains argues also that it was prejudiced when the court permitted Fischer to comment on the comparative results of state regulatory surveys conducted on Golden Plains and other nursing homes managed by HRS. Fischer testified that he was "practically elated" that those results indicated that HRS' performance was above that customary for the nursing home industry. Golden Plains had sought to present evidence of HRS' failure to adequately perform other nursing home contracts, but was refused at the very outset of trial. HRS moved in limine to exclude such evidence, and was sustained. Golden Plains expressly withheld objection. To convict the court of error, Golden Plains cites neither legal principal nor authority, but only the adage, "what's sauce for the goose is sauce for the gander." There is no indication that Golden Plains retendered the proof the court excluded at outset or otherwise attempted to redress that claim of disparate treatment. The point is denied.

Golden Plains complains also that Fischer was allowed to give opinion testimony based upon his knowledge of custom and practice in the industry as to the meaning of two specific clauses in the management contract. One had to do with the negotiation of third-party contracts with patients, between Golden Plains and patients, governmental agencies and institutions. The other had to do with telephone expenses. Golden Plains argues that the provisions were not ambiguous and so did not require interpretation. Fischer gave no definitive reading of the telephone expense provision. Nor did he testify to the custom and practice of the industry on negotiation of third-party contracts. The court sustained the Golden Plains objection to that attempted initiative. Golden Plains argues that despite that ruling the court "allowed the testimony." That is not apparent, but, if so, it came in without objection. The point is denied.

C. *Exhibit 7*

 Fischer testified that HRS personnel visited the Golden Plains home on a regular basis. Exhibit 7 was a list compiled by the office at his direction of the dates of the visits and the names of the HRS personnel who made them. Golden Plains objected to the tender on several grounds, but the court refused the exhibit because it was not material to any issue. The exhibit was retendered and received later in the litigation. Golden Plains objected because the exhibit was prepared after the termination of the contract by Golden Plains. The objection here is that there was no foundation shown that the list was accurate or that it otherwise qualified as business record evidence. No such objection was made at the trial, however, and so was waived. *Frank v. Environmental Sanitation Management*, 687 S.W.2d 876, 884[17] (Mo. banc 1985).

## V. Other Trial Error

 Rule 55.33(a) provides that leave to amend "shall be freely given when justice so requires." Golden Plains argues that the denial of its motion for leave to amend the answer to assert the affirmative defense of failure to mitigate damages violated that rule and was prejudicial error. The motion was presented on June 2, 1989, and denied on June 12, 1989, the day of trial. Golden Plains argued to the trial court that leave to amend was not made earlier because the factual basis for the affirmative defense was not learned until the completion of the deposition of HRS witness Fischer. The motion was then filed on that very day. HRS stated to the court that the subject of the motion to amend was discovered on April 27, 1989, more than a month before the motion was filed. There was no further exposition of the issue. The denial of the amendment, presumably, was responsive to the contention that it was untimely.

Golden Plains argues that the unfairness of the rule is exacerbated because it was a discovery order entered by the court itself that prevented Golden Plains from uncovering the factual basis for the affirmative

defense any earlier. The court had sustained objections to the Golden Plains interrogatory concerning "all nursing homes [HRS] has managed in the last fifteen (15) years." Golden Plains argues that it would have learned through the answers that HRS "did not enter into a single new management contract after the Golden Plains' contract was terminated," and so would have derived a factual basis for the affirmative defense at that earlier time. The argument is disingenuous. That interrogatory was not framed so as to discover whether or not HRS made any effort to replace the Golden Plains' management contract.

Golden Plains contends that for us to rule that the motion to amend was filed untimely would chill "attorney compliance with the ethical guideline of not making allegations, including affirmative defenses, without some reasonable basis in fact." That mode of attorney performance [which is not only an ethical expectation, but also an affirmative duty, *see* Rule 55.03] assumes a performance also diligent.

In the circumstances presented, we cannot say that the denial of the amendment was a palpable abuse of discretion, or otherwise subverted justice. *Baker v. City of Kansas City*, 671 S.W.2d 325, 329[7–12] (Mo.App.1984).

The judgment is affirmed.

All concur.

MANFORD, J., did not participate in the decision of this case due to his death on February 12, 1991.