John L. FLAKE, on behalf of himself and all others similarly situated, Plaintiff,

v.

William K. HOSKINS, et al., Defendants.

No. Civ.A. 98–2450–KHV.

United States District Court, D. Kansas.

June 17, 1999.

Lynda J. Grant, Peter E. Zinman, Goodkin, Labaton, Rudoff & Sucharow LLP, New York City, C. Maxwell Logan, Samuel P. Logan, Logan Law Firm LLC, Olathe, KS, Leigh R. Lasky, Lasky and Rifkind, Ltd., Chicago, IL, for Plaintiff.

Michael Thompson, Brian D. Martin, Blackwell Sanders Peper Martin LLP, Kansas City, MO, H. Douglas Hinson, Rebecca Lamberth, Alston & Bird, Atlanta, GA, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on defendants' *Motion To Dismiss Pursuant to Fed. R. Civ, P. 12(b)(1) and 12(b)(6)* (Doc. # 18) filed January 6, 1999, defendants' *Motion For Reconsideration* (Doc. # 43) filed March 18, 1999, and defendants' *Motion For Oral Argument* (Doc. # 44) filed March 23, 1999. Defendants move to dismiss, all six of plaintiff's claims. Defendants also seek reconsideration of the Court's refusal to consider evidence outside of the complaint, in connection with the motion to dismiss. For the reasons stated below, the Court finds that the motion for reconsideration should be denied and that the motion to dismiss should be sustained in part and denied in part. The Court held oral argument on May 26, 1999, and therefore sustains defendants' motion for oral argument.

## Motion For Reconsideration

■ The Court has discretion whether to grant or deny a motion to reconsider. *See Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1395 (10th Cir.1988). The Court may recognize any one of three grounds justifying reconsideration: an intervening change in controlling law, availability of new evidence, or the need to correct clear error or prevent manifest injustice. *See Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981); *Burnett v. Western Resources, Inc.,* 929 F.Supp. 1349, 1360 (D.Kan.1996). A motion to reconsider is not a second chance for the losing party to make his strongest case or to dress up arguments that previously failed. *Shinwari v. Raytheon Aircraft Co.,* 25 F.Supp.2d 1206, 1208 (D.Kan.1998) (citing *Voelkel v. General Motors Corp.,* 846 F.Supp. 1482, 1483 (D.Kan.), *aff'd* 43 F.3d 1484 (10th Cir.1994)). Such motions are not appropriate if the movant only wants the Court to revisit issues already addressed or to hear new arguments or supporting facts that could have been presented originally. *Id.* (citing *Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991), *cert. denied,* 506 U.S. 828, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992)).

■ On March 16, 1999, the Court entered an order stating that it would not consider matters outside of the pleadings when ruling on defendants' motion to dismiss. *See Order* (Doc. # 40) filed March 16, 1999. Defendants ask the Court to reconsider that decision, but they have not demonstrated any of the three grounds which might justify relief. The issue has been already addressed. While defendants cite cases which allow the consideration of outside documents, the matter is within the Court's discretion. *See Lowe v. Town of Fairland,* 143 F.3d 1378, 1381

(10th Cir.1998); *GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384 (10th Cir.1997). The Court finds that consideration of such evidence is better suited for a motion for summary judgment and exercises its discretion in refusing to consider the outside evidence at this earlier stage of the litigation.

## Motion to Dismiss Standard

In ruling on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the Court must assume as true all well pleaded facts in plaintiff's complaint and view them in a light most favorable to plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *see also Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984).

The Court must make all reasonable inferences in favor of plaintiff. *Zinermon,* 494 U.S. at 118, 110 S.Ct. 975; *see also* Fed.R.Civ.P. 8(a); *Lafoy v. HMO Colorado,* 988 F.2d 97, 98 (10th Cir.1993). The issue in reviewing the sufficiency of plaintiff's complaint is not whether he will prevail, but whether he is entitled to offer evidence to support his claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his theory of recovery that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence,* 927 F.2d 1111, 1115 (10th Cir.1991). Although plaintiff need not precisely state each element of his claims, he must plead minimal factual allegations on those material elements that must be proved. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).

## Facts

Plaintiff brings this action individually and on behalf of a class of shareholders of J.C. Nichols Company ("JCN"), a Missouri corporation, and on behalf of a subclass of shareholders who obtained JCN stock through participation in the JCN Employee Stock Ownership Plan ("ESOP"). Plaintiff brings suit against JCN; Highwoods Properties, Inc. ("Highwoods"); William K. Hoskins, the former chairman of JCN's board of directors ("board"); Barret Brady, former president, chief executive officer and director of JCN; and Clarence L. Roeder, Kay Nichols Callison, John A. Ovel, Thomas J. Turner, III, William V. Morgan and Mark C. Demetree, former directors of JCN.

Under Section 2.35 of the trust agreement which governs the ESOP, JCN is the "plan administrator," which the agreement defines as the person designated to administer the ESOP. Under Section 13.11, the plan administrator is a named fiduciary of the plan.

Section 2.17 also defines a plan fiduciary as any person who

(a) exercises any discretionary authority or discretionary control respecting management of this Plan or exercises any authority or control with respect to management or disposition of the Trust's assets,

(b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Trust or has any authority or responsibility to do so, or

(c) has any discretionary authority or discretionary responsibility in the administration of the Plan, including, but not limited to, the Trustees, the Employer and its representative body, and the Plan administrator.

Under Section 6.12 of the trust agreement, if the trustee received from someone other than JCN an unsolicited offer to purchase JCN stock, the trustee was required to ask the JCN board of directors for an advisory opinion whether the sale would be in the best interests of ESOP participants and beneficiaries.

ESOP participants had the right to vote their own shares, but could delegate their shares to be voted by the trustee of the JCN Employee Stock Option Trust ("ESOT"). The ESOT held some 1.4 million shares of JCN stock in trust on behalf of over 600 ESOP participants. The ESOT held over 30 percent of JCN's outstanding stock.

Starting on April 18, 1997, Intrust Bank, N.A. ("Intrust") served as trustee of the ESOT. Plaintiff was a member of the ESOP. As of May 29, 1998, JCN had approximately 4.6 million shares of outstanding common stock, with 3.2 million shares held by 148 shareholders and the remaining shares held by the trust on behalf of more than 600 ESOP participants.

In late 1996 and during the first half of 1997, JCN became a potential takeover target, with parties offering to purchase some or all JCN stock. On October 23, 1996, Integrated Property Management, Inc. ("Integrated") offered to buy all ESOP shares for $32.00 per share. At the time, the ESOP shares amounted to 22 percent of the outstanding stock of JCN. Around March of 1997, Realty Capital Corporation ("Realty") offered to purchase all ESOP shares at about $26.00 per share.

The Nichols family has owned JCN stock for decades, and its average tax basis in the stock is extremely low. Plaintiff alleges that defendants therefore wanted to prevent a cash buyout of JCN and instead looked for stock-for-stock transactions. Plaintiff alleges that defendants acted to limit the Nichols family tax liability, regardless of the benefits to the remaining JCN shareholders. The Nichols family controlled the JCN board, both through its power as a 26 percent shareholder, and through family and business relationships with several of the individual defendants.

Around May of 1997, realizing that JCN was a potential takeover target and that its control of JCN was threatened, the JCN board disseminated a proxy which attempted to solicit shareholder approval of antitakeover measures. At the same time, the individual defendants delayed transferring to the ESOT some 680,000 shares of stock to which it was entitled. If the ESOT had received these shares, it would have owned 33 percent of JCN instead of 22 percent, and would have been the single largest JCN,shareholder.

On May 9, 1997, Realty offered to purchase all shares of JCN for at least $26 per share in cash, or some higher price. The individual defendants voted unanimously to reject Realty's offer. On May 15, 1997, JCN issued a press release stating that it was "not for sale." The press release quoted Mr. Brady as stating that "[JCN's] opportunities for growth and development have never been more positive or more exciting." The press release also expressed the board's "strong belief that the proposed antitakeover measures are in the best interests of the shareholders of the Company."

As ESOT trustee, Intrust resisted defendants' antitakeover measures because the "poison pills" would adversely affect the ability of shareholders such as the ESOP to maximize the value of their stock. As a result, JCN removed the proposals from the agenda for the shareholder meeting in May 1997.

Around June 13, 1997, Realty offered to purchase the ESOP shares for $36 per share, At that time, the ESOT held 31 percent of JCN's stock on behalf of ESOP participants. In June of 1997, Maefield Development Corporation ("Maefield") also communicated to Intrust an offer to purchase the ESOP shares. Intrust relayed both offers to the JCN board.

Around July of 1997, in an effort to seek control of the company, Cerberus Partners ("Cerberus") offered to buy the ESOP shares for $42 cash per share.[1] Intrust

---

**1.** Cerberus was a hedge fund that already held 17.2 percent of JCN common stock on behalf of various funds.

communicated this offer to the JCN board. Around the same time, two other sophisticated investors, Franklin Mutual Advisors and Angelo, Gordon & Co., acquired almost nine percent of JCN. Around August 8, 1997, Cerberus amended its offer to include the 680,000 shares which JCN owed the ESOP.

The JCN board responded to Intrust's requests for advisory opinions by advising Intrust to decline Realty's offer in light of the higher offers it had received, and to seek an extension from Maefield to allow the JCN board time to consider the Maefield offer.

As a result of Intrust's requests, the JCN board accelerated its antitakeover strategy to counter the cash offers and Intrust's strong support of a sale of JCN. In order to entrench themselves in their positions, some JCN executives entered agreements that would force JCN to pay them a total of $10.7 million if their employment was terminated under a change in control of the company.

On July 25, 1997, the JCN board held a special meeting, stating that its purpose was to consider information from Intrust regarding an offer to purchase JCN stock. The board, however, did not consider that inquiry in any meaningful way. Instead, in direct response to threats to its control, especially the accumulation of JCN stock by Cerberus, the JCN board adopted a second poison pill defense. The board gave existing shareholders the right to purchase one share of JCN common stock for each share owned, at half the market price, if a new investor acquired 15 percent or more of JCN's stock. This provision had the purpose and effect of greatly diluting the percentage holding of any investor who obtained more than 15 percent of the company. The board also provided that these purchase right measures would not go into effect (or could be suspended) if JCN's directors approved a stock purchase by an interested investor. The board thereby discriminated against unfriendly offerors and tilted the playing field to favor those bidders who were willing to make an offer which benefitted defendants and the Nichols family.

Around July of 1997, the JCN board took further measures to thwart cash bidders. The board engaged Morgan Stanley, purportedly for the purpose of reviewing "various capital planning and strategic alternatives available to JCN." In the proxy, the individual defendants stated that JCN was retaining Morgan Stanley "because management of JCN had identified significant development projects and outlined a strategy for growth with which it was prepared to succeed." The true motive, however, was to find and justify a "white knight" bidder to avoid a cash buyout.

JCN stated that Morgan Stanley presented it with four options: (1) a private issuance of convertible preferred stock; (2) a private issuance of JCN common stock; (3) a public offering of JCN common stock; or (4) a strategic combination with a public real estate company or a public real estate investment trust ("REIT").

In September of 1997, Bosfield LLC ("Bosfield"), an affiliate of Maefield, offered to purchase the ESOP shares at $59.00 per share for a total purchase price of $82,000,000.00, on the condition that the JCN board remove its poison pills. Intrust accepted the offer, believing that it was in the best interests of the ESOP participants. The deal was never consummated, however, because the JCN board refused to lift the poison pills.

During the fall of 1997, substantial and well-financed entities such as Duke Realty Investments Inc. and Simon DeBartolo Group, Inc. ("Duke/Simon") expressed interest in acquiring JCN for cash. The individual defendants, however, prevented any acquisition.

Around November of 1997, Intrust retained Duff & Phelps to determine the fair market value of JCN stock. JCN agreed to indemnify Duff & Phelps for the appraisal. Duff & Phelps valued the JCN

stock at $61 per share as of October 31, 1997. Intrust therefore rejected as insufficient the Cerberus offer of $42 per share.

On November 18, 1997, Duke/Simon signed the confidentiality agreement which was necessary for it to receive the access to books and records that would enable it to make an offer. The JCN board, however, refused to provide Duke/Simon sufficient information necessary to make a proposal.

Around December 19, 1997, Bosfield sent Intrust an amendment to its ESOP stock purchase offer, increasing the purchase price for the ESOP stock to $70 per share. Intrust forwarded a copy of the amended offer to JCN's general counsel, but the JCN board did not respond to Bosfield's offer.

Realizing that it was "in play," JCN changed its earlier position of refusing sale and focused on entering into a combination with another real estate company. JCN refused offers to finance a private placement of convertible preferred stock by Lazard Freres Real Estate Investors, LLC ("Lazard") and Blackacre Capital Group ("Blackacre"), an affiliate of Cerberus. Instead, JCN commenced negotiations with Highwoods to allow Highwoods to effectively take control and buy out JCN for stock, thus rescuing JCN from a potential cash acquisition. Around December 22, 1997, JCN entered into a merger agreement with Highwoods and an affiliate of Highwoods.[2]

Under the terms of the agreement, Highwoods would acquire all of the outstanding shares of JCN. In exchange, for each share of JCN stock, JCN shareholders could elect to receive either (1) between 1.84 and 2.03 shares of stock in Highwoods, depending on a 20–day moving average of the share price of Highwoods, or (2) $65 in cash. The cash payment to JCN shareholders was limited to 40 percent of the total consideration, however,

and in the event that more than 40 percent of JCN shareholders elected to receive cash, those shareholders would receive proportionate amounts of cash and Highwoods stock.

The merger agreement stated that the acquisition was subject to the approval of a two-thirds majority of JCN shareholders. In the event that JCN's directors failed to recommend the approval of the merger, or recommended an alternate transaction, the merger would be terminated and JCN would be obligated to pay Highwoods a termination fee up to $17.2 million.

Around December 23, 1997, Cerberus filed a notice with the Securities and Exchange Commission ("SEC"), advising that it might ask JCN shareholders to reject the proposed transaction with Highwoods because the consideration was too low, the termination fee was too high, and the transaction had the air of a "white knight" arrangement which would allow Highlands to buy JCN for a lower-than-market price in exchange for allowing JCN managers and directors to keep their jobs.

Around December 23, 1997, Duke/Simon sent a letter to some of the individual defendants, advising that JCN had failed to provide all information necessary for it to make a bid. Duke/Simon stated that it believed the value of JCN stock might be significantly greater than $65 per share, and that if JCN provided Duke/Simon access to JCN management and additional information, Duke/Simon would move "very expeditiously to confirm the stock price and develop a strategy that would deal with any relevant non-financial constraints." Duke/Simon expressed an interest in a transaction that would "result in significantly more value to the Nichols' shareholders" than that provided by the proposed acquisition by Highwoods.

On January 12, 1998, Duke/Simon indicated to Mr. Brady that it anticipated making an offer of at least $75 per share,

---

2. On April 29, 1998, the merger agreement was amended to remove the ceiling on the percentage of the transaction which could be in stock.

and that it was prepared to structure the offer to include both cash and stock. Defendants never provided Duke/Simon the information it requested, however, and they did not meaningfully discuss with Duke/Simon an alternative transaction that could provide greater consideration than the Highwoods acquisition. Defendants also failed to disclose Duke/Simon's interest to JCN shareholders. Because of this hostility, Duke/Simon notified the JCN board on January 28, 1998 that it would not proceed in a transaction with JCN.

Similarly, Intell Management and Investment Company ("Intell") complained on several occasions in January and February of 1998 about JCN's repeated refusals to meet or provide pertinent books and records. Intell cited this lack of information, along with the high termination fees and JCN's requirement that Intell deposit $17.2 million to cover the fee, as reasons for ceasing its efforts to purchase JCN. Cerberus also stated that the lack of information, high termination fee, and JCN's "standstill clause" in its confidentiality agreement all constituted efforts by defendants to "chill bidding."

Despite these obstacles, several bidders expressed interest in purchasing JCN at higher prices than the $65 per share which Highwoods had offered. Around February 11, 1998, Intell advised the JCN board that it was interested in purchasing JCN at $75 per share in cash. Given the high termination fee and defendants' commitment to the Highwoods' acquisition, however, Intell, made its offer contingent on the JCN shareholders rejecting the Highwoods offer. On June 17, 1998, Blackacre offered to purchase JCN for $70 cash per share.

Intrust repeatedly requested that JCN indemnify Duff & Phelps for a current appraisal of the value of JCN's stock, as it had done in the past. JCN refused to do so. Without an indemnification agreement, Intrust was unable to retain Duff & Phelps. The individual defendants refused to indemnify an appraisal because they knew that Intrust was not permitted to make its own recommendations to ESOP participants, but could provide them with Duff & Phelps' conclusion and recommendation. As a result, the individual defendants prevented ESOP participants from casting an informed vote.

Around June 2, 1998, Highwoods and JCN disseminated a "Joint Proxy Prospectus" to solicit shareholder approval of the Highwoods' acquisition. The proxy was filed with the SEC and acted as a registration statement and prospectus for the issuance of Highwoods stock to shareholders as part of the acquisition. Plaintiff alleges that the proxy contained false and misleading statements and omissions of material fact which, if disclosed, would have significantly altered the total mix of available information.

Throughout the proxy, JCN's board of directors stated that they believed the acquisition was in the best interests of JCN shareholders. The board did not have a reasonable basis for this recommendation, however, because (1) individual defendants knew about and had received cash bids which offered JCN shareholders greater consideration at less risk than the consideration being offered by Highwoods; (2) the average trading price of Highwoods stock since the acquisition was approximately $28.17 (around the time plaintiff filed this action), making the consideration received by Highwoods shareholders for each converted JCN share approximately $57.20; (3) the board's conduct had thwarted other, higher bidders for JCN stock, (4) the board refused to consider cash bids because of the tax consequences to the Nichols family, and (5) JCN could have financed a convertible preferred stock offering.

The proxy stated that the JCN board favored a convertible preferred offering but because it was unable to obtain Intrust's support for such an action, the board feared that it would not be able to get the required 50 percent shareholder

vote which would allow it to authorize the issuance of such securities. According to the proxy, this fear caused the board to reject a convertible preferred offering. The proxy did not specify how or when Intrust had stated that it would not support a private issuance of convertible preferred stock. Intrust never publicly expressed any opposition to such an issuance. Furthermore, prior to the merger agreement, both Lazard and Cerberus had offered to do a convertible preferred offering—contradicting the board's statement that such an offering was its first choice. Also, the proxy did not disclose the fact that Bosfield had offered $70 per share for the ESOP shares.

The proxy stated that the acquisition was necessary to JCN's business strategy. The acquisition was not consistent, however, with JCN's business history or business plan. JCN had never sought a strategic combination in order to obtain financing, and the acquisition was not consistent with either its prior business plans or history or its long term business plan. In addition, the acquisition was not necessary in order to obtain financing. JCN had $40 million in cash, only $23 million in mortgage debt, a good cash flow and money from a tax increment financing.

The proxy stated that the JCN board had authorized Morgan Stanley to "canvass" parties that it considered most likely to enter either a private issuance of JCN common stock or a strategic merger with JCN. The proxy failed to mention that the board did not authorize Morgan Stanley to seek bidders for an acquisition of JCN.

The proxy was misleading in its reliance on Morgan Stanley's fairness opinion. While the opinion stated that the acquisition was fair to shareholders from a financial point of view, the opinion was incomplete and inadequate. The proxy did not state the limitations that JCN placed on Morgan Stanley. For instance, JCN did not ask Morgan Stanley to opine about the fairness of the acquisition as compared to

other potential combinations or a cash sale of the company. Morgan Stanley also assumed that the information which the JCN board had provided reflected the "best currently available estimates and judgments of the future financial performance of the Company...." JCN's board, however, had only provided Morgan Stanley a common stock valuation by Houlihan Lokey Howard & Zukin, valuing JCN stock as of December 31, 1996. This appraisal was outdated. The Morgan Stanley opinion also failed to account for the outstanding cash offers for JCN's stock, and Morgan Stanley therefore did not have sufficient information to form an opinion whether the acquisition was fair.

The proxy stated that the JCN board engaged Morgan Stanley to "review various capital planning and strategic alternatives available to JCN ... because management of JCN had identified significant development projects and outlined a strategy for growth with which it was prepared to proceed." Plaintiff alleges that the individual defendants failed to disclose the real reason for entering the acquisition: the fact that the JCN board perceived a threat to its control of JCN and the fact that a cash acquisition of JCN posed a threat of adverse tax consequences to the Nichols family.

The proxy did not disclose that the individual defendants had refused to indemnify Duff & Phelps for an appraisal of the ESOP stock. Without this appraisal, ESOP participants lacked material information necessary for an informed decision about the acquisition.

The proxy represented that Intrust had expressed satisfaction with the general terms of the acquisition as presented on November 25, 1997. This representation was false and misleading because the general terms of the initial agreement were not the same as the final terms of the agreement. Intrust never expressed satisfaction with the general terms of the final agreement.

As noted above, the ESOT held over 30 percent of JCN's outstanding stock. ESOP votes were therefore crucial to the two-thirds margin necessary to approve the acquisition. A special shareholders' meeting was scheduled for July 1, 1998, for a vote on the acquisition. Before that meeting, individual defendants embarked on an extremely aggressive campaign to gain favorable votes from ESOP participants by mailing letters, directly telephoning ESOP participants, encouraging ESOP participants to attend meetings with defendants, and establishing a toll-free "helpline" exclusively for ESOP participants.

On June 8, 1998, William Hoskins sent a letter to ESOP participants on behalf of the entire JCN board. The letter was incorporated as part of the proxy. The letter was sent only to ESOP participants, but claimed that the board was acting in its "fiduciary responsibility to protect the interests of all shareholders." The letter provided selected and incomplete bits of information from the proxy and effectively encouraged ESOP participants not to read the proxy itself. The letter stated that "[defendants] know the proxy is long and complicated" and that they therefore wanted to explain "in less legalistic terms what we view as the key points." The letter encouraged ESOP participants to call JCN's proxy solicitation firm, rather than reading the "lots of pieces of paper that are very legally oriented." The proxy solicitation firm, however, used a highly aggressive method to coerce participants into approving the acquisition.

The letter of June 8 repeatedly stressed that the acquisition was the best and only offer, ignoring the numerous other expressions of interest in JCN and its stock. The letter stated that of the companies which Morgan Stanley had canvassed in 1997, Highwoods was the only one to make a definitive offer for JCN. It failed, however, to outline the numerous obstacles in the merger agreement that prevented other bidders. The letter described two "large, prominent real estate companies"

that "reviewed our records and then indicated they had decided NOT to pursue a transaction." It failed to state, however, that the companies to which it referred—Duke/Simon—protested the lack of information which the JCN board provided and were not allowed to make an adequate proposal.

The June 8 letter referred to Intell as "a little known company" and understated Intell's strong interest, stating that Intell said "it MIGHT consider making an offer" for JCN and that Intell "ha[d] hinted that it might make a higher offer." In a letter dated February 11, 1998, however, Intell stated that if JCN shareholders voted down the acquisition, it intended to pursue an acquisition of JCN for $75 per share in cash. The letter failed to disclose the reasons for Intell's failure to make a definitive offer—the $17.2 million breakup fee and the $17.2 million deposit.

The June 8 letter repeatedly suggested that if ESOP participants elected the cash option, they would receive a full $65 value of consideration, or a pro-rata amount of cash "with the remainder in Highwoods stock." The letter stated in bold print that: "WE URGE YOU TO INSTRUCT THE TRUSTEE TO VOTE YOUR SHARES IN FAVOR OF THE HIGHWOODS MERGER."

Like the proxy, the letter of June 8 also stated that Morgan Stanley had "advised the Board that this is a fair price" but failed to mention the limits on Morgan Stanley's engagement or the fact that Morgan Stanley's opinion was based on stale appraisals.

Despite the fact that the board had actual knowledge of the Bosfield offer, the letter of June 8 stated that "[w]e also understand (that Bosfield) made its interest known to the Trust." The letter failed to mention that Bosfield had actually made an offer three days before the board executed the merger agreement with Highwoods. The letter also failed to mention

that the board had not rendered an advisory opinion regarding Bosfield's offer.

The letter of June 8 also referred to the $17.2 million termination fee as "customary in merger agreements." The board further stated that "we would not expect this provision to impede a serious bidder from making a higher offer." Plaintiff alleges that this statement was false because the very purpose of the termination fee was to impede other potential bidders.

The letter of June 8 also suggested that ESOP shareholders would suffer dire consequences if they did not approve the acquisition:

If the merger is not approved, the Company will have to move quickly to raise capital or borrow funds to meet its cash needs. In the event J.C. Nichols were to sell common stock to generate cash, it may be forced to do so at a price below $65 per share.

The letter failed to state that (1) JCN's financial position made it an attractive borrower to any commercial lender; (2) both Blackacre and Lazard had already indicated an interest in infusing capital into JCN through a preferred stock offering; and (3) even after the merger agreement had been executed, JCN stock traded above $65 because the market assumed that JCN would attract a higher offer.

The June 8 letter also mentioned Highwoods' decision to terminate the ESOP, which would be attractive to ESOP participants who would be able to receive an early distribution of their retirement assets.

On June 16, 1998, the JCN board sent a letter to all shareholders that was substantially identical to its June 8 letter to ESOP participants.

On June 18, 1998, the JCN board sent another letter to ESOP participants, advising that Columbia Financial Advisors had completed an analysis of the company's value as of December 31, 1997, and valued the company for ESOP purposes at $65 per share. The letter falsely asserted that

Intrust had acknowledged to JCN that Columbia was "totally independent." The letter also stated that due to Columbia's valuation, the JCN board "[saw] no reason for the Trust to spend an additional $125,-000 of your money—beyond the $1.2 million of trust expenses already incurred over the last year—on yet another opinion from Duff and Phelps." This statement failed to mention the relative staleness of the Columbia Financial appraisal, as compared to a new appraisal by Duff & Phelps. The letter also failed to inform ESOP participants that the Columbia Financial appraisal did not take into account any of the interest in the stock after December 31, 1997. The letter also referred to Intrust's request for indemnification of Duff & Phelps as "unprecedented," despite the fact that it had previously been common practice, as evidenced by the fact that JCN had indemnified Duff & Phelps in 1997.

The June 18 letter stated that the board was "confident that the Trustee will agree" that the acquisition was in the best interests of shareholders, even though the board knew at the time of the letter that Intrust did not intend to vote for the merger and that JCN's refusal to indemnify Duff & Phelps prevented Intrust from obtaining an independent valuation on which to base its opinion.

The June 18 letter also stated that on May 27, 1998, at the request of Highwoods, the JCN board had resolved to terminate the ESOP if the acquisition was successful. Like the June 8 letter, the June 18 letter also was incorporated in the proxy,

On July 1, 1998, at the special meeting of shareholders, 76 percent of the outstanding JCN shares approved the acquisition. Around July 13, 1998, the acquisition was consummated. Each JCN shareholder who opted to receive stock received 2.03 shares of Highwoods stock for each JCN share. Since the acquisition, Highwoods stock has steadily fallen. It recently trad-

ed as low as $22.75, which is equivalent to $46.18 for a converted JCN share. More than 40 percent of JCN shareholders opted to receive cash from the acquisition. Each shareholder who opted for cash therefore received only a portion of his or her consideration in cash and the remainder in Highwoods stock. The consideration which JCN shareholders received as a result of the acquisition was far less than what they could have received from a competitive offer for JCN. Because Highwoods' stock has declined, the value of shareholder consideration is less than the agreed $65 per share. Also as a result of the acquisition, shareholders who had 100 percent control of JCN now have less than 10 percent control of Highwoods.

Defendants terminated Intrust as trustee around July 13, 1998, because Intrust had opposed the acquisition and believed that JCN and its officers and directors had breached their fiduciary duties to their shareholders.

Plaintiff brings six claim against defendants. Plaintiff first claims that JCN and the individual defendants violated their fiduciary duties to plaintiff under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985), and *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). Plaintiff also claims that JCN and the individual defendants violated fiduciary duties which they owed to the ESOP participants under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). In his third claim, plaintiff alleges that all defendants violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 77n, by making material misrepresentations and omissions in the proxy. Likewise, in his fourth claim, plaintiff alleges that Highwoods violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k by making material misrepresentations and omissions in the registration statement which Highwoods filed in conjunction with

the acquisition of JCN. Plaintiff's fifth claim alleges that all defendants violated Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l, by making false statements in the proxy, which constituted a prospectus. Finally, plaintiff's sixth claim alleges that the individual defendants are liable for the violations alleged in plaintiff's third, fourth, and fifth claims because they were control persons under Section 15 of the Securities Act of 1933 and Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 77o, 78t.

Defendants deny that they violated fiduciary duties under *Revlon, Unocal,* or ERISA. Defendants specifically argue that they were not ERISA fiduciaries in regard to the conduct that plaintiff challenges. They also argue that plaintiff has failed to state a claim under federal securities law because (1) plaintiff fails to allege how certain statements were false; (2) some of the alleged misrepresentations and omissions were not material, while others were actually true and fully disclosed; and (3) some of the alleged omissions are merely disguised claims for breach of fiduciary duty. Defendants also argue that they are not liable in plaintiff's fourth and fifth claims because the Highwoods acquisition was not a public offering. Finally, defendants argue that plaintiff's sixth claim should be dismissed because "control person" liability is not implicated unless plaintiff first shows a primary violation of the securities law.

## Analysis

### A. Count I—Breach Of Fiduciary Duty

Plaintiff first claims that JCN and the individual defendants violated their fiduciary duties to JCN shareholders. Defendants ask the Court to dismiss Count I, arguing that they are entitled to the benefit of the business judgment rule because they did not owe enhanced fiduciary duties to JCN shareholders.[3]

---

3. Plaintiff's breach of fiduciary duty is a state claim. JCN was incorporated in Missouri

and both sides assume that Missouri law applies. The Court therefore applies it in this

 Under the business judgment rule, directors generally receive wide latitude in their corporate decisions. *Herbik v. Rand*, 732 S.W.2d 232 (Mo.App.1987). "The business judgment rule protects the directors and officers of a corporation from liability for intra vires decisions within their authority made in good faith, uninfluenced by any other consideration than the honest belief that the action subserves the best interests of the corporation." *Nixon v. Lichtenstein*, 959 S.W.2d 854 (Mo.App. 1997) (quoting *McKnight v. Midwest Eye Institute of Kansas City, Inc.*, 799 S.W.2d 909, 913 (Mo.App.1990)). When a corporate director or officer's decision falls within the business judgment rule, the Court will not interfere with that decision. *Id.*

Plaintiff argues that this case invokes an enhanced fiduciary standard because the JCN board had duties under both *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985) and *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). Defendants disagree, arguing that plaintiff's complaint does not fall within the circumstances giving rise to *Revlon* duties and that defendants' actions were reasonable under *Unocal.*

**1. Revlon**

Under *Revlon*, once directors decide to sell or break up the corporation, they have a legal duty to maximize shareholders' value. 506 A.2d at 182. This duty arises

(1) "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company," (2) "where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company;" or (3) when approval of a transaction results in a "sale or change of control." In the latter situation, there is no "sale or change in control" when " '[c]ontrol of both [companies] remain[s] in a large, fluid, changeable and changing market.' "

*In re Santa Fe Pac. Corp. Shareholder Litigation*, 669 A.2d 59, 71 (Del.1995) (quoting *Arnold v. Society for Sav., Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del.1994) (citations omitted)).

 Defendants first challenge the proposition that Missouri would adopt *Revlon*'s duty to obtain the best available value. Defendants argue that under *Revlon*, the JCN board was require to seek and accept the best possible price, while R.S.Mo. § 351.347 requires a corporate board to consider various criteria when deciding whether to accept an offer.[4] The

context. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Also, plaintiff apparently agrees that without enhanced scrutiny under *Revlon* or *Unocal*, he cannot make a viable state law claim for breach of fiduciary duty in the face of the business judgment rule.

4. Section 351.347 provides in part:
1. In exercising its business judgment concerning any acquisition proposal, as defined in subsection 2 of this section, the board of directors of the corporation may consider the following factors, among others:
(1) The consideration being offered in the acquisition proposal in relation to the board's estimate of
(a) The current value of the corporation in a freely negotiated sale of either the corporation by merger, consolidation or otherwise, or all or substantially all of the corporation's assets;

(b) The current value of the corporation if orderly liquidated;
(c) The future value of the corporation over a period of years as an independent entity discounted to current value;
(2) Then existing political, economic and other factors bearing on security prices generally or the current market value of the corporation's securities in particular;
(3) Whether the acquisition proposal might violate federal, state or local laws;
(4) Social, legal and economic effects on employees, suppliers, customers and others having similar relationships with the corporation, and the communities in which the corporation conducts its businesses;
(5) The financial condition and earning prospects of the person making the acquisition proposal including the person's ability to service its debt and other existing or likely financial obligations;

Court first notes that Missouri looks to Delaware law in examining corporate actions. *See AHI Metnall, L.P. v. J.C. Nichols Co.*, 891 F.Supp. 1352, 1356 (W.D.Mo. 1995) (applying Delaware's *Unocal* standard to Missouri corporation). Second, the duties of a corporate board under *Revlon* are not truly different from its duties under R.S.Mo. § 351.347. *Revlon* does not require a board to accept the highest offer regardless of any other considerations. Rather, the board must simply accept the best alternative for shareholders, all things considered.

> In assessing the bid and the bidder's responsibility, a board may consider, among various proper factors, the adequacy and terms of the offer, its fairness and feasibility; the proposed or actual financing for the offer, and the consequences of that financing; questions of illegality; the impact of both the bid and the potential acquisition on other constituencies, provided that it bears some reasonable relationship to general shareholder interests; the risk of nonconsumation; the basic stockholder interests at stake; the bidder's identity, prior background and other business venture experiences; and the bidder's business plans for the corporation and their effects on stockholder interests.

*Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1282 n. 29 (Del.1989). The possible factors to consider under *Revlon* track those listed in R.S.Mo. § 351.347. The only noticeable difference is that Section 3.51.347(1)(4) allows the board to consider the effect of the sale on other constituencies, without expressly requiring a link to general shareholder interests. This difference does not appear to be significant, however, because in all business actions, a corporate board of directors owes a fiduciary duty to shareholders and must generally operate for their benefit. Any consideration of other constituencies must

(6) The competence, experience and integrity of the person making the acquisition

therefore have at least a reasonable relationship to the general interests of shareholders. The Court therefore finds that Missouri law does not differ in any way that would eliminate the duties of the JCN board under *Revlon*.

■ Defendants claim that the JCN board did not initiate any bidding process. Therefore, they argue that plaintiff does not fit the first *Revlon* situation, which occurs when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break up of the company. Plaintiff's response is that the board did decide to put JCN up for sale, after receiving escalating bids for the ESOP stock.

Plaintiff's response does not address whether this allegation is sufficient to bring himself within the first prong of *Revlon*. At the hearing on defendants' motion to dismiss, plaintiff argued that JCN initiated a "limited" bidding process. Plaintiff's complaint, however, does not allege an active bidding process; it alleges that defendants specifically sought a white knight buyer. The record contains no allegation that JCN received or solicited other bids. Plaintiff's complaint therefore does not allege facts that place plaintiff within the first category.

■ Plaintiff argues that the board's conduct falls within the second category, which involves a situation where, "in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break up of the company." Plaintiff alleges that the board determined to put the company up for sale after receiving escalating bids for the ESOP stock., Defendants counter that no facts suggest that the board intended to break up JCN. To allege a break up of a corporation, plaintiff must allege that defendants' actions end the corporate existence of the company.

proposal.

*Revlon,* 506 A.2d at 173 (break up when purchaser intended to split corporation and dispose of assets); *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34 (merger or sale does not equate to break up of corporation); Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence,* 19 J. Corp. L. 583, 600–01 (1994) (break up concerns splitting assets of corporation); Lawrence A. Cunningham & Charles M. Yablon, *Delaware Fiduciary Duty Law After QVC And Technicolor: A Unified Standard (And The End of Revlon Duties?),* 49 Bus. Law. 1593, 1618 (1994) (break up concerns sale of "individual divisions"). Plaintiff does not allege that defendants sought a transaction that would break up the corporation. Indeed, plaintiff alleges the opposite—that defendants sought a transaction that would keep JCN intact and thus enable JCN executives to maintain their management positions.

█ Finally, under the third category—which applies when approval of a transaction results in a "sale or change of control"—defendants argue that plaintiff's claim must be dismissed because he cannot show a sale or change of control of JCN. Plaintiff fails to allege a sale or change in control when " '[c]ontrol of both [companies] remain[s] in a large, fluid, changeable and changing market.' " *Arnold,* 650 A.2d at 1289 (quoting *QVC,* 637 A.2d at 47). This is true even when former stockholders of the company are reduced to minority shareholders in the acquiring company. *Id.* at 1290; *see also Santa Fe,* 669 A.2d at 71. Plaintiff attempts to evade this obstacle in various ways.

Plaintiff first argues that JCN had a change in control because it was a publicly-held corporation, while Highwoods' structure as an REIT eliminates the right of public shareholders to obtain a controlling share in the corporation. Plaintiff argues that Highwoods is not subject to control because it would lose its tax status as an REIT if one shareholder held more than 9.8 percent of the stock in Highwoods. The complaint, however, does not allege that Highwoods was an REIT. Second, Highwoods' status as an REIT does not by itself prevent a shareholder from obtaining more than 9.8 percent of its shares; Highwoods would simply lose its REIT status if a shareholder did obtain a controlling share. *See* 26 U.S.C. § 856.

More importantly, the fact that no one can obtain a controlling share of Highwoods does not help plaintiff's claim. JCN shareholders have not lost their powers as public shareholders in JCN for a corporation that is controlled by someone else. *See QVC,* 637 A.2d at 43 (control changed when one individual would obtain voting control instead of public market). JCN shareholders did not lose their power to elect directors or veto charter amendments, mergers, consolidations, sales of all assets, and dissolutions of Highwoods. *See id.* at 43. JCN shareholders simply suffered a dilution of voting power. This fact alone is not sufficient to constitute a change of control; a dilution of shares occurs in every stock-for-stock transaction. *See Arnold,* 650 A.2d at 1290; *Santa Fe,* 669 A.2d at 71. Even though no particular shareholder has a controlling share, control remains in the hands of shareholders who "have virtually identical interests with respect to the company: to maximize the value of their shares." *See Kahan,* 19 J. Corp. L. at 595. Before the Highwoods acquisition, a large, fluid market held control over JCN. After the acquisition, a large, fluid market held control over Highwoods.

Plaintiff argues that the cases cited by defendants involved stock for stock mergers, while the merger here involves cash and Highwoods stock for JCN stock. Plaintiff cites no case law which makes such a distinction, and the Court fails to see the difference. JCN shareholders had the ability to choose a straight stock for stock merger if they so desired. The dilution of stock is not sufficient to establish a change of control. Any other reduction

that shareholders suffered as a result of the cash/stock alternative was at their own discretion. A shareholder cannot accept the partial cash buy-out and then complain that his or her power as a shareholder has been wrongfully reduced as a result of that choice.[5]

Plaintiff also argues that the difference in size between JCN and Highwoods shows a change in control because the merger was not between "equals." Plaintiff cites no case law which finds a change of control based solely on a merger of unequal corporations. The only relevance that the Court can ascertain by any difference in size is simply that JCN shareholders have suffered a substantial dilution in their voting power. Again, such a dilution is not enough to show a change of control.

 Plaintiff is unable to meet any of the three circumstances which give rise to enhanced scrutiny under *Revlon.* Plaintiff seeks leave to amend his complaint, and the Court should grant leave under Fed. R.Civ.P. 15(a) unless such an amendment would be futile. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1126 (10th Cir.1997). At this point, the Court cannot say that plaintiff cannot plead any facts that would allow a claim under *Revlon.* Specifically, plaintiff might be able to allege that JCN falls within the first circumstance by initiating an active bidding process before accepting the Highwoods offer. The extent to which JCN solicited bids and potential purchasers is currently unclear. Local Court rules establish the procedure that must be followed, however, in seeking leave to amend. Specifically, D. Kan. Rule 15.1 states that a motion for leave to amend must include a signed original of the proposed amended pleading. Without reference to the specific language of the proposed amendment, the Court cannot speculate whether plaintiff might be able

to allege an actionable claim under *Revlon.* The Court therefore declines plaintiff's current request for leave to amend, without prejudice to future consideration of that issue in compliance with D.Kan. Rule 15.1.

### 2. Unocal

 Under *Unocal Corp. v. Mesa Petroleum Co.,* enhanced judicial scrutiny applies "whenever the record reflects that a board of directors took defensive measures in response to a 'perceived threat to corporate policy and effectiveness which touches upon issues of control.'" *Unitrin, Inc. v. American Gen. Corp.,* 651 A.2d 1361, 1372 n. 9 (Del.1995). Once plaintiff establishes that defensive measures have been employed in a contest for control, the board has the burden of showing (1) that it "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (2) "that [its] defensive response was reasonable in relation to the threat posed." Once the board has established the reasonableness of its perception of a threat and the proportionality of the response, it receives the protection of the business judgment rule. *Santa Fe,* 669 A.2d at 71 (citations omitted).

Defendants argue that they had reasonable grounds to believe that JCN faced the threat of a two-tiered hostile takeover where one of the offering companies would achieve control of JCN and then force minority shareholders to dispose of their shares at a reduced price, and that past offers to purchase the ESOP stock were inadequate. Defendants argue that based on these reasonable beliefs, they took reasonable measures in adopting the shareholder rights plan on July 25, 1997, and that plaintiff's claims must therefore be dismissed.[6]

---

**5.** Interestingly, according to plaintiff's current theory, defendants would not have invoked *Revlon* if they had merely utilized a stock for stock merger; yet plaintiff clearly objects to such an agreement, arguing that

defendants should have utilized a cash buy-out.

**6.** Plaintiff's complaint contains allegations of numerous antitakeover tactics that defendants used, and alleges that all of these tactics vio-

The Court cannot conclude solely from plaintiff's complaint, however, that defendants reasonably perceived the threat of a two-tiered takeover. In *Santa Fe,* the Delaware Supreme Court noted that claims under *Unocal* can rarely be disposed of on a motion to dismiss:

The complaint does not admit that the Board had proper grounds for its decision. Nor does the Board enjoy a presumption to that effect. . . . As the terminology of enhanced judicial scrutiny implies, boards can expect to be required to justify their decisionmaking, within a range of reasonableness, when they adopt defensive measures with implications for corporate control. This scrutiny will usually not be satisfied by resting on a defense motion merely attacking the pleadings.

*Santa Fe,* 669 A.2d at 72. Defendants bear the burden of proving that their belief was reasonable, and the allegations of the complaint are not sufficient to discharge their burden.[7]

Defendants argue that Delaware courts have recognized that potential two-tier takeovers justify defensive measures. Defendants cite *Unocal,* 493 A.2d at 956; *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1342 (Del.1987); and *Gilbert v. El Paso Co.,* 575 A.2d 1131, 1145 (Del.1990). None of these cases, however, require the Court to find that defendants reasonably perceived a threat in the facts of this case. Both *Unocal* and *Ivanhoe,* involved fully-disclosed two-tier takeover attempts: the offerors had stated their intention to use such a coercive method. *See Unocal,* 493 A.2d at 949; *Ivanhoe,* 535 A.2d at 1339. Only *Gilbert* involved a situation like plaintiff alleges here, where the offeror did not expressly admit that it

would use a two-tier takeover. *See Gilbert,* 575 A.2d at 1134–35. In *Gilbert,* however, defendants moved for summary judgment and the record contained evidence that the offeror's true motive was to acquire all of the target corporation. *See id.*

Here the Court must view all allegations in plaintiff's favor. The complaint merely alleges that offers were made; it does not allege that any of the offers were part of a two-tiered takeover. Defendants' cases do not support their argument that they reasonably perceived a threat of a two-tiered offer simply because an initial offer was made. All cases cited by defendants involved further evidence which indicated to the target board that defensive measures were necessary. Here, viewing the allegations in plaintiff's favor, the complaint simply alleges that the offers for the ESOP shares enhanced shareholder value.

■ The Court recognizes that the offers themselves suggest a potential for a two-tiered takeover. The mere potential, however, is not sufficient to meet defendants' burden of showing a reasonable fear. To meet their burden, defendants must also show that they conducted a reasonable investigation to develop their fear. *See Gilbert,* 575 A.2d at 1144; *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d 1140, 1152 (Del.1989). Nothing in the complaint hints at any investigation into the offers, let alone a reasonable investigation to determine whether the threat required defensive measures and if so, which ones. In addition, defendants must take the defensive actions in good faith. *See id.* Clearly the complaint does not require the Court to find that defendants implemented the shareholder rights plan in good faith

---

lated defendants' duties under *Unocal.* Defendants only seek to dismiss plaintiff's allegations regarding the shareholder rights plan.

7. Defendants argue that the reasonableness of their perceptions and actions is enhanced by the fact that the majority of directors were independent and disinterested. This may well

be true but the Court cannot find in plaintiff's complaint any allegation that most directors were independent and disinterested. In fact, plaintiff's complaint alleges that the board was under the control of interested individuals and for purposes of this motion, the Court must accept this allegation as true.

on behalf of JCN shareholders, especially the shareholders that might get squeezed out by such a takeover. *See* ¶¶ 33, 43, 53.

Defendants argue that they had reason to believe that the initial offers prior to July 25, 1997 were inadequate. This argument derives from plaintiff's allegation that the successful Highwoods offer of $65 was inadequate. Defendants argue that because all offers before July 25 were significantly less than $65, defendants obviously had reason to believe that these offers were inadequate. Defendants' argument, however, twists plaintiffs allegations. Plaintiff does allege that the Highwoods offer was inadequate at $65, but this allegation is based on the course of events leading up to Highwoods' offer. Viewing the complaint in the light most favorable to plaintiff, it shows a steady stream of escalating offers as the competition for control of JCN heated up. Plaintiff alleges that by the end of this competition, $65 per share was inadequate. This allegation does not necessarily mean that $65 was inadequate six months earlier. Nothing in the complaint indicates that the board reasonably believed that the standing offers on July 25, 1997 were inadequate. Unless defendants are able to see the future, the final merger price, which was not known on July 25, 1997, cannot form the grounds for such a belief. While the board may have had reason to believe that the earlier offers were inadequate, the facts which might support that belief are not in plaintiff's complaint. In addition, the complaint does not suggest that defendants conducted a reasonable investigation into the value of the stock or made their decision in good faith. *See Gilbert,* 575 A.2d at 1144; *Paramount Communications, Inc. v. Time Inc.,* 571 A.2d at 1152.

Plaintiff has met his burden of alleging that defendants took defensive measures in response to a contest for control. *See Santa Fe,* 669 A.2d at 71. Defendants have failed to meet their burden of showing that the board's actions were reasonable as a matter of law. The Court therefore denies defendants' motion to dismiss plaintiff's breach of fiduciary duty under *Unocal.*

## B. Count II—Breach Of Fiduciary Duty Under ERISA

■ Plaintiff claims that defendants' treatment of the ESOP shareholders constitutes a breach of fiduciary duty under ERISA. Defendants argue that they were not fiduciaries under ERISA and that even if they were, the challenged actions were not within the scope of their fiduciary duties under ERISA.

Under ERISA, defendants can become fiduciaries in three different ways:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

■ In determining whether defendants are fiduciaries under ERISA, the Court first examines the terms of the ERISA plan. *See Varity Corp. v. Howe,* 516 U.S. 489, 502, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Fiduciary duty is not an all-or-nothing concept; defendants have fiduciary duties only over those activities for which they are responsible. *See Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 61 (4th Cir.1992). The ESOP plan lists JCN and its "representative body" as fiduciaries responsible for administering the plan. Plaintiff alleges that the JCN board is JCN's "representative body."

The plan gave defendants the power to "administer" or "manage" the trust, but it did not give them control over the investment or sale of ESOP shares. *See* Sections 2.35, 2.17(a), (c) (Complaint ¶ 25, 26). The plan states that administration and management of the ESOP involve tasks and duties which are separate from the "management or disposition of the Trust's assets." *See* Section 2.17(a), (c) (Complaint ¶ 25). Plaintiff alleges that the JCN board had discretionary authority or control over ESOP assets because the plan required that Intrust, as trustee, submit all offers for ESOP shares for an advisory opinion by the JCN board. *See* Section 6.12 (Complaint ¶ 28). Plaintiff does not allege that Intrust was required to follow the board's opinion, however, or that Intrust was in any other way limited in accepting an offer to purchase stock. Likewise, the fact that the plan gave defendants the power to remove the trustee does not establish that they had authority over the disposition of ESOP assets.[8] *See Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.,* 793 F.2d 1456, 1460 (5th Cir.1986). The plan therefore does not show that defendants had any authority or control over Intrust. Under the plan, defendants were not fiduciaries regarding the actual disposition of trust assets; they were only fiduciaries regarding (1) plan administration, (2) the issuance of advisory opinions regarding disposition of the trust assets, and (3) removing the trustee.

Because the plan did not make defendants fiduciaries regarding the disposition of ESOP assets, plaintiff alleges that defendants nevertheless exercised discretionary authority or control over the management and disposition of plan assets. The complaint contains no indication, however, that defendants had control or authority over the disposition of ESOP assets. Indeed, plaintiff's complaint suggests that defendants did not control the disposition of assets, because Intrust accepted the Bosfield offer despite defendants' opposition. If defendants had the power to manage and dispose of ESOP shares, they could have merely rejected the offers, instead of creating poison pills which affected the entire corporation. In addition, defendants would not have needed to send letters to ESOP shareholders to influence their votes for the Highwoods acquisition.

■ Plaintiffs argue that defendants' creation of poison pills and other prohibitive acts show an exercise of actual control over ESOP shares. Defendants did not take such action, however, because they had authority over the ESOP assets; they took such action because while they were able to control the entire corporation, they lacked the ability to control the disposition of ESOP assets. ERISA contemplates that an employer often will act as both an employer and plan fiduciary, and not all of an employer's business activities implicate fiduciary duties under ERISA. *Hockett v. Sun Co., Inc.,* 109 F.3d 1515, 1522 (10th Cir.1997). At best, defendants only attempted to indirectly control the ESOP shares by adopting corporation-wide penalties. Defendants never obtained actual decision-making power specifically over ESOP assets. *See Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 535 (7th Cir. 1991) (control or authority requires actual decision-making power). Intrust retained the ability to negotiate and accept offers for disposition of ESOP shares, subject only to corporation-wide restrictions by defendants. While defendants' poison pill ultimately prevented the Bosfield sale, this fact does not indicate that defendants had decision-making power over the ESOP assets. Intrust continued to have the power

---

8. In his *Response,* plaintiff alleges that defendants had the ability to remove the trustee under Section 13.11 of the trust agreement. This allegation is not contained in the complaint, however, and plaintiff therefore seeks leave to amend if the Court finds that his ERISA claim is insufficient. For purposes of this motion, the Court assumes that plaintiff could amend to allege that defendants had the ability to remove the trustee under Section 13.11 of the trust agreement, and examines the legal sufficiency of that allegation.

to accept any offers, it only needed to find a buyer who would accept the heavy restrictions which defendants imposed. While defendants' restrictions indirectly influenced the Intrust negotiations with potential buyers, defendants did not have the direct ability to accept or reject any offers regarding ESOP shares. *See Martin v. Feilen,* 965 F.2d 660, 665 (8th Cir. 1992) (when action does not involve administering plan or investing plan assets, indirect effect on plan does not implicate fiduciary duties under ERISA).

In short, the complaint does not show that defendants controlled the disposition of ESOP shares; it shows precisely the opposite—defendants knew that offers to purchase ESOP shares put them at risk of losing control over JCN; they reacted by making corporation-wide changes precisely because they could not control the ESOP shares.[9]

In *Plaintiff's Memorandum In Opposition To Defendants' Motion To Dismiss Pursuant To Fed.R.Civ,P. 12(b)(1) and 12(b)(6)* (Doc. # 48) filed March 26, 1999, plaintiff includes a new factual allegation which suggests that defendants had control over Intrust's ability to sell the stock because Intrust was required to either obtain an advisory opinion from defendants or wait 90 days before accepting an offer. Even accepting this allegation as true, however, it does not establish that defendants controlled the disposition of ESOP shares. Under the plan, the JC

In his *Response,* plaintiff also alleges that defendants had control over the disposition of ESOP assets because defendants exercised their ability to remove the trustee. Defendants did not exercise this pow-

er, however, in any way that shows control over ESOP assets at the relevant time. Defendants removed Intrust after ESOP shareholders approved the Highwoods acquisition. Even if this act were sufficient to demonstrate control over ESOP assets, it came too late. The record contains no indication that during the relevant time, Intrust relinquished to defendants its control over ESOP assets. *See Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.,* 793 F.2d 1456, 1460 (5th Cir.1986).

Plaintiff's complaint, and his brief in opposition to the pending motion, allege that defendants are ERISA fiduciaries for purposes of administering the plan, rendering advisory opinions regarding disposition of ESOP assets, and removing the trustee. Plaintiff does not allege that defendants were ERISA fiduciaries with respect to the actual management and disposition of plan assets. Only Intrust had that power. The Court must therefore determine whether any of the purported ERISA violations implicated defendants' fiduciary duties.[10]

In the complaint, plaintiff specifically identifies various respects in which defendants breached their fiduciary duties under ERISA: (1) false representations in the proxy; (2) abuse of knowledge obtained by virtue of their advisory role over the ESOP trustee; (3) coercive tactics in obtaining the votes of ESOP participants; and (4) placing their personal interests and those of the Nichols family over the interests of the ESOP shareholders. In opposing defendants' motion to dismiss, plaintiff also alleges that defendants blocked a sale of ESOP stock by (1) refusing to negotiate

---

9. Plaintiff cites *Maez v. Mountain States Tel., and Tel., Inc.,* 54 F.3d 1488, 1498 (10th Cir. 1995), for the proposition that the Court must accept as true his broad allegation that defendants were ERISA fiduciaries. Indeed, while the Court must generally accept plaintiff's factual allegations as true, this rule does not apply to conclusory allegations. *Southern Disposal, Inc. v. Texas Waste Management,* 161 F.3d 1259, 1262 (10th Cir.1998). While

plaintiff alleges that the JCN board members were fiduciaries under ERISA, the factual allegations that form the basis for his conclusion do not support it.

10. According to plaintiff's new allegation, defendants are also fiduciaries regarding their power to delay the trustee's acceptance of an offer by 90 days.

with potential bidders for JCN stock; (2) refusing to provide Intrust the required recommendation concerning potential bids; (3) adopting the shareholder rights plan to counter offers for the ESOP stock; (4) entering into the Highwoods' acquisition agreement only three days after Bosfield offered $70 per share for the ESOP shares; (5) failing to refer to the Bosfield offer in the proxy; (6) refusing to indemnify Duff & Phelps for an appraisal of the value of the ESOP shares; and (7) using false and misleading letters to solicit the votes of ESOP participants.

Most of plaintiff's allegations revolve around the disposition of the ESOP shares. Plaintiff's chief allegation is that defendants took all of the above actions for the sole purpose of preventing Intrust from selling the ESOP shares. Because defendants had no fiduciary duties regarding the sale and disposition of ESOP assets, however, defendants' action generally do not violate ERISA.

■ Some allegations do implicate defendants' fiduciary duties under ERISA, which include (1) plan administration, (2) the issuance of advisory opinions regarding disposition of the trust assets, and (3) removing the trustee. First, plaintiff alleges that defendants violated their fiduciary duty to render an advisory opinion regarding the offers for ESOP stock.[11] Second, plaintiff's allegations regarding

the letter of June 18, which went only to ESOP participants, also implicate defendants' fiduciary duties under ERISA.[12] These allegations state a claim for breach of defendants' fiduciary duties under ERISA as administrators of the ESOP plan. *See Varity*, 516 U.S. at 503, 116 S.Ct. 1065 (administrators violate fiduciary duty under ERISA by providing misleading information about plan).[13] The Court otherwise sustains defendants' motion to dismiss plaintiff's claim that defendants owed fiduciary duties regarding the disposition of ESOP assets.

## C. Counts III, IV, V, and VI—Material Misrepresentations And Omissions In Violation Of Federal Securities Law

■ Plaintiff alleges that defendants made material misrepresentations and omissions in the proxy and the letters of June 8 and June 18 to shareholders and ESOP participants. Defendants ask the Court to dismiss. Many of defendants' challenges are based upon facts not alleged in plaintiff's complaint. As the Court has previously ruled, however, it will not rely on such facts; it will merely examine plaintiff's allegations on this motion to dismiss. The Court therefore denies defendants' motion to dismiss Counts III, IV, V and VI to the extent that it is based on facts not pleaded in the complaint. The

---

**11.** Plaintiff also alleges that defendants refused to indemnify Duff & Phelps for an appraisal. His complaint, however, does not allege that such payment was a duty of the plan administrator. In his response to defendants' motion to dismiss, plaintiff makes this allegation and seeks leave to amend his complaint. Plaintiff also seeks leave to amend to allege that defendants had a fiduciary duty not to abuse their power to delay the trustee for 90 days, which plaintiff alleges that defendants abused by adopting the Highwoods acquisition before Intrust could accept the Bosfield offer. As with plaintiff's request for leave to amend under *Revlon*, the proper procedure is for plaintiff to file a motion for leave to amend under D. Kan. Rule 15.1.

**12.** In the letter, defendants stated that because of the Columbia Financial valuation, a

Duff & Phelps appraisal of ESOP shares was unnecessary. While defendants owed fiduciary duties as plan administrators, the complaint alleges that they provided ESOP shareholders misleading information regarding the value of their stock and the need for another stock appraisal.

**13.** Defendants allege that they did not take this action as plan administrators, but clearly stated that they were acting in their corporate capacity. Even if defendants' statement is enough to avoid their fiduciary obligations, however, this allegation is not contained in the complaint. Plaintiff has properly alleged a breach of defendants' ERISA duty regarding the letter of June 18.

Court now turns to defendants' other arguments regarding these claims.

Plaintiff alleges that the JCN board made a general statement that it believed the Highwoods acquisition to be in the best interests of JCN shareholders, and that its statement was false and misleading because the board could have pursued a convertible stock offering. ¶ 99. Defendants argue that plaintiff has failed to show how the latter allegation makes the general statement false or misleading. *See Koppel v. Wien,* 575 F.Supp. 960, 969 (S.D.N.Y. 1983) (plaintiff must set out facts demonstrating how statement is false or misleading). Defendants, however, ignore plaintiff's later allegation that the JCN board expressly stated in the proxy that it preferred a convertible stock offering. ¶ 101. Assuming this allegation to be true, the board's failure to mention that its preferred option was actually available could mean that its statement was false or misleading.

Plaintiff also alleges that the board's statement was false or misleading because of the other offers and interest in buying JCN. Defendants argue that no other firm offers existed, and that mere indications of interest cannot form the basis for a claim under federal securities law because they are immaterial as a matter of law. *See South Coast Services Corp. v. Santa Ana Valley Irr. Co.,* 669 F.2d 1265, 1273 (9th Cir.1982). To show immateriality as a matter of law, however, defendants must overcome a significant hurdle at this point in the litigation:

> In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with "fact-specific inquir[ies]" such as materiality. Nonetheless, courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged

misstatements or omissions are plainly immaterial.

*Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir.1997) (citations omitted). "An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see also Grossman,* 120 F.3d at 1119. "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC* 426 U.S. at 449, 96 S.Ct. 2126. "Although generally more a factual question under the mixed standard of review, the question of materiality is to be resolved as a matter of law when the information is 'so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality.'" *Connett v. Justus Enters. of Kan., Inc.,* 68 F.3d 382, 384 (10th Cir.1995) (quoting *Garcia v. Cordova,* 930 F.2d 826, 829 (10th Cir.1991) (citations omitted)).

Defendants would divide the universe into two categories of offers—firm offers and mere expressions of interest—and ignore the vast gray area that exists between an initial expression of interest and a tender offer. Defendants argue that because no other offers were firm or definite, they are immaterial as a matter of law. After *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), however, it is clear that a firm and definite offer is not required for materiality as a matter of law. Instead, in determining whether information is so material as to require disclosure, the Court must evaluate the extent of negotiations and effect of the potential transaction. *See id.* at 231–32, 108 S.Ct. 978 (adopting the standard set forth in *TSC*).[14] In deter-

**14.** While *Basic* involved liability under Section 10b–5, federal courts generally equate materiality for insider trading and fraudulent failure to disclose. *See Weiner v. Quaker Oats* Co., 129 F.3d 310 (3d Cir.1997); *see also Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (adopting materiality standard for failure to disclose cases for insider trading case).

mining whether negotiations are material, the Court must weigh the probability that the transaction will occur and the magnitude of the effect of such a merger on the companies involved. *Id.* at 238, 108 S.Ct. 978.

While defendants allege that information regarding other offers was immaterial, they somewhat miss the point. Defendants seek to dismiss the allegation that they fraudulently stated that they believed that the Highwoods acquisition was in the best interests of the corporation. ¶ 99. Defendants' statement was clearly material, regardless whether defendants acted fraudulently in failing to disclose information regarding the other offers.

> Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest. Naturally, then, the shareowner faced with a proxy request will think it important to know the directors' beliefs about the course they recommend and their specific reasons for urging the stockholders to embrace it.

*Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1090–91, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Plaintiff alleges that the Highwoods acquisition was not in the best interests of JCN shareholders and that defendants did not truly believe their statement to the contrary. The complaint alleges material misrepresentations re-

gardless whether the proxy should have included other offers.[15]

In addition, even when the Court considers whether the other offers and interest were so unimportant as to be immaterial, the Court is unable to say that the other bidders' contacts were "so obviously … [un]important to an investor, that reasonable minds cannot differ on the question of materiality." *Connett,* 68 F.3d at 384. Here, plaintiff alleges more than casual expressions of interest by potential bidders for JCN. Intell offered to purchase JCN for $75 per share on the conditions that it complete a due diligence review and JCN reject the Highwoods acquisition. Neither condition reduced Intell's offer to a mere "indication of interest." The complaint alleges that Intell made a higher offer that was subject to standard conditions. Blackacre offered to purchase JCN for $70 per share. Nothing in the complaint suggests that Blackacre's offer was less than firm. In addition, the Bosfield offer of $70 is material, even though it only addressed the ESOP shares, because plaintiff alleges that the JCN board made misleading statements about that offer in the letters of June 8 and 18, which are also part of the proxy.[16]

■ Plaintiff also alleges that the board could not have believed that the Highwoods acquisition was in shareholders' best interests because the value of Highwoods stock dropped after the merger. Defendants argue that this fact is immaterial because they cannot be held liable for failing to predict the drop in value of Highwoods stock. Plaintiff does not counter this argument, and the Court

---

**15.** Defendants also seek to dismiss plaintiff's allegation that the board thwarted other bids and refused to consider all cash bids. *See* ¶ 99(d), (e). Defendants claim that this allegation must be dismissed because defendants did not need to disclose facts constituting a breach of fiduciary duty. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). As discussed, however, plaintiff's allegation is not that defendants needed to disclose this information, but that this information shows why defen-

dants' statement regarding the best interests of shareholders was false. *See Virginia Bankshares,* 501 U.S. at 1190–91, 111 S.Ct. 2749.

**16.** Defendants also challenge plaintiff's allegation that Duke/Simon was interested in pursuing a bid. Plaintiff does not address this argument, and the Court therefore assumes that plaintiff concedes that the potential offer from Duke/Simon was not material enough to require inclusion in the proxy.

finds that the drop is not a material fact which could possibly have been included in the proxy. *See Lewis v. Chrysler Corp.,* 949 F.2d 644, 653 (3d Cir.1991). Plaintiff also does not explain why the drop would show that defendants' belief was false or that the underlying fact was false when defendants made the statement. *See Virginia Bankshares,* 501 U.S. at 1190–91, 111 S.Ct. 2749.

■ The proxy stated that the board did not pursue a convertible preferred stock offering because it could not obtain the support of Intrust. ¶ 101. Plaintiff alleges that this statement was false because the proxy does not state how or when Intrust made its opposition known, and Intrust never publicly opposed such action. ¶ 102. Defendants argue that plaintiff fails to show how the proxy statement is false. *See Koppel,* 575 F.Supp. at 969. The Court agrees. Plaintiff does not allege that Intrust did not oppose such action, plaintiff merely alleges that Intrust never made this opposition known publicly. Even assuming this allegation to be true, it does not establish that Intrust did not oppose a convertible preferred stock offering.

■ The proxy states that the JCN board authorized Morgan Stanley to canvass parties who might agree to purchase a private issuance of JCN common stock or enter into a strategic merger with JCN. Plaintiff alleges that this proxy statement is misleading because it fails to mention that Morgan Stanley was not authorized to seek cash bidders to acquire JCN. Defendants argue that because the proxy states the extent of Morgan Stanley's authorized engagement, any statement about their lack of authorization was so obvious as to be immaterial to investors. Plaintiff counters that the proxy statement is not so clear that it was obvious that Morgan Stanley was unable to pursue cash bidders. Making all inferences in favor of plaintiff, the proxy does not necessarily inform investors that Morgan Stanley could not pursue cash bidders. Specifically, the term "strategic merger," without more, is too vague as to obviously exclude the potential for cash bidders. The omission is not immaterial as a matter of law, because reasonable minds could differ about its importance. *Connett,* 68 F.3d at 384.

■ The proxy failed to disclose the Bosfield offer to purchase the ESOP shares, and the letter of June 8 allegedly "understated" the board's knowledge of the offer. While plaintiff alleges that the proxy statement was false and misleading, defendants counter that the offer was immaterial because it concerned only the ESOP shares and not all JCN stock. While it may be true that the board did not need to disclose the offer, the board chose to disclose the offer in the letter of June 8, and therefore in the proxy itself. Any statements that defendants made about the offer were material if they were likely to influence JCN shareholders. *See TSC,* 426 U.S. at 449, 96 S.Ct. 2126. The letter was clearly an attempt to influence ESOP shareholders, who held a significant percentage of JCN, to believe that $65 per share from Highwoods was their best option. It attempted to downplay the Bosfield offer for this purpose. While the Bosfield offer was not for the entire company, the Court cannot say that defendants' statements regarding the offer were immaterial. They had a substantial likelihood of influencing shareholders.

■ The proxy stated that the merger was necessary for JCN's business strategy. ¶ 106. Plaintiff alleges that this statement was false because the merger was inconsistent with JCN's business history and financial situation. *Id.* Defendants argue that plaintiff fails to explain how the merger was inconsistent with JCN's business history. Defendants simply fail to read far enough. As plaintiff states two paragraphs later, JCN "had never before sought a strategic combination in order to obtain financing." ¶ 108. Elsewhere in the complaint, plaintiff alleges that on May 15, 1997, the JCN board stated that JCN was

"not for sale." Despite this statement, plaintiff alleges that the JCN board then reversed course and began looking for a beneficial merger or acquisition with Highwoods. Viewing the complaint as a whole, plaintiff sufficiently alleges that the Highwoods acquisition was inconsistent with JCN's business history.

■ Plaintiff claims that the proxy was misleading when it stated that Morgan Stanley's analysis was based on the "best currently available estimates and judgments of the future financial performance of [JCN]." ¶ 112. Defendants argue that plaintiff fails to show how this statement was false because plaintiff only alleges that the board relied on an outdated stock appraisal which determined the value of JCN stock on December 31, 1996. As defendants argue, the stock appraisal does not provide any estimate or judgment regarding JCN's future financial performance. Therefore, to the extent that plaintiff intends the appraisal to counter the allegation about future financial performance, the Court agrees with defendants. Reading the entire complaint in context, however, it is clear that plaintiffs' chief allegation is that the Morgan Stanley opinion was misleading because it found that $65 per share for the Highwoods' acquisition was fair from a financial point of view. As plaintiff alleges, Morgan Stanley relied on an outdated stock appraisal from December 31, 1996, and did not compare the Highwoods offer to any of the existing cash offers. Viewing these facts in a light most favorable to plaintiff, the proxy's reliance on the Morgan Stanley opinion was misleading because it did not disclose what information Morgan Stanley considered before finding the transaction to be fair for shareholders, nor did it explain the limits of its opinion.

Defendants argue that plaintiff fails to show how the proxy description of the Morgan Stanley fairness opinion was false and misleading. Plaintiff alleges that the proxy did not explain that Morgan Stanley was subject to limitations, however, and was not asked to opine on the fairness of the merger *compared to other potential combinations.* ¶ 111.

■ Plaintiff also alleges that the proxy omitted to mention that the JCN board had refused to indemnify Duff & Phelps for an appraisal of the ESOP shares. ¶ 114. Defendants argue that this omission was immaterial because it would not influence how investors would vote on the merger. Viewing all inferences in favor of plaintiff, however, this information is not obviously unimportant. Reasonable investors (even those not in the ESOP) could be influenced by information that the JCN board was not agreeable to a current appraisal of JCN stock prior to a vote on the Highwoods acquisition.[17]

■ Plaintiff alleges that the individual defendants failed to disclose their true motives for entering into the Highwoods' acquisition—protecting their control over JCN and obtaining favorable tax consequences for the Nichols family. ¶ 119. Defendants argue that they did not need to disclose this information and that plaintiff's claim is nothing more than a fiduciary duty claim in disguise. *See Santa Fe Indus.,* 430 U.S. at 473–74, 97 S.Ct. 1292. "The failure to disclose the motive behind a director's decision is not actionable unless accompanied by objective and external deeds or omissions." *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 638 (3d Cir.1989) (citing *Biesenbach v. Guenther,.* 588 F.2d 400, 402 (3d Cir.1978)). The Court agrees that the allegations in paragraph 119 of the complaint allege only a breach of fiduciary duty and do not

17. In their reply, defendants argue that this action also constitutes a mere breach of fiduciary duty. Defendants did not raise this argument regarding this allegation in their original motion, and the Court therefore does not

consider the issue. *See Medina v. City of Osawatomie,* 992 F.Supp. 1269, 1272–73 (D.Kan.1998) (court will not consider issues first raised in reply briefs).

include material misrepresentations or omissions. While the motives of the individual defendants are relevant regarding the truth of their statements, see *Virginia Bankshares*, 501 U.S. at 1190–91, 111 S.Ct. 2749, defendants did not violate the securities laws by omitting their motives from the proxy.[18]

 The letter of June 8 stated that Intell "might" make an offer for JCN. ¶ 128. Plaintiff alleges that this statement was false because Intell actually stated that it "intended" to make an offer. Defendants argue that the difference is mere semantics. Viewing the allegations in the light most favorable to plaintiff, however, the Court cannot necessarily agree.

 The letter of June 8 also stated that "breakup fees are customary" and would not impede serious bidders. ¶ 136. Defendants cite two cases which state that breakup fees are not unusual and do not prevent negotiations with other bidders. In this case, however, plaintiff's complaint alleges that breakup fees did impede other bidders. Viewing the facts in the light most favorable to plaintiff, the allegations are sufficient to suggest that defendants' statement was false or misleading.

 The letter of June 8 stated that if shareholders did not approve the High-woods' acquisition, JCN would have to move quickly to raise capital. It further stated that JCN might sell JCN stock at under $65 per share. ¶ 137. Plaintiff alleges that the letter failed to state that JCN could have borrowed money to finance its capital needs, that certain parties had

shown "interest" in infusing capital into JCN, and that JCN stock had traded above $65 per share after the announcement of the merger. Defendants argue that they did not have a duty to disclose the trading value of JCN stock after the merger because it was public knowledge. Plaintiff does not address defendants' argument and the Court agrees that defendants did not need to disclose the trading value of JCN stock. *See Goldberger v. Baker*, 442 F.Supp. 659, 667 (S.D.N.Y. 1977).[19]

 Defendants also argue that they did not need to disclose the existence of possible alternatives to selling JCN stock for under $65 per share, e.g., a preferred stock offering or borrowing of necessary capital. While it is true that defendants do not need to disclose every alternative to a chosen course of conduct, *see Kahn v. Wien*, 842 F.Supp. 667, 677 (E.D.N.Y. 1994), defendants here had not chosen to sell JCN stock for under $65 per share if the acquisition failed; they only mentioned such a course of action as a coercive tactic to get shareholder approval of the action which they actually proposed—the High-woods acquisition. Viewing all inferences in the light most favorable to plaintiff, the Court is unable to say that the existence of other alternatives was immaterial. JCN threatened to sell stock for less than the acquisition price for the purpose of influencing its shareholders to vote for the acquisition. Once defendants threatened such conduct, it is hardly a stretch to believe that reasonable investors would be

---

18. This finding has little actual effect on plaintiff's claims, because plaintiff separately alleges that defendants took numerous steps to further their ill-intended motives by driving away other bidders and failing to provide sufficient information. ¶ 126–27.

19. In the Court's view, the complaint mistakenly states that defendants "omit[ted]" this information. As the Court reads the complaint, plaintiff's chief concern is that defendants made a false statement when the June 18 letter suggested that defendants could sell stock for less than the acquisition price if

shareholders did not approve the acquisition. As defendants note, plaintiff must allege how defendants' statement was false. Plaintiff attempts to meet this burden in part by showing the actual trading value of JCN stock, which suggests that defendants would not have needed to sell JCN stock for less than $65 per share. While defendants did not need to disclose the market value in the proxy, this information is still relevant to showing that defendants knowingly made a material misrepresentation.

influenced by information which revealed this threat to be false or exaggerated.

 The letter of June 18 stated that Intrust acknowledged that Columbia Financial was a totally independent company. ¶ 142. Plaintiff alleges that Intrust never made such acknowledgment. Defendants argue that this fact was immaterial, however, because plaintiff does not deny that Columbia Financial was independent. The Court is not persuaded by defendants' argument. The mere fact that Columbia Financial may be independent does not change the falsity of the statement. The letter reported that Intrust had admitted Columbia Financial was independent. Viewing the allegation in the light most favorable to plaintiff, a reasonable investor could have viewed as material an admission by Intrust that Columbia Financial was independent. The JCN board was trying to explain why Intrust was acting unreasonably in demanding an appraisal from Duff & Phelps. The letter related the alleged admission by Intrust in order to suggest that even Intrust should have recognized that the Duff & Phelps appraisal was unnecessary and that the board's response was therefore appropriate. Such a statement is not immaterial as a matter of law.

 The letter of June 18 also stated that the board was confident that Intrust would agree that the Highwoods acquisition was in the best interests of JCN shareholders. ¶ 145. Plaintiff alleges that this statement was false. Defendants argue that this statement of the board's opinion was not material. Their argument runs exactly contrary to *Virginia Bankshares*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929, which held that such statements can be material in the proper circumstances. "A statement of reasons, opinions, or belief by ... a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1131 (2d Cir.1994). While defendants cite *Freedman v. Value Health Inc.*, 958 F.Supp. 745, 758 (D.Conn.1997), the cited portion deals with the company's statements about its future financial performance. *Id.* The *Freedman* court expressly found that statements of opinion are actionable when the speaker knows that the statement is false or misleading. *Id.* at 752–53. That is exactly what plaintiff alleges in this case—defendants stated that they believed Intrust would approve the merger even though they knew that this statement was false.

The letter of June 18 stated that because of the prior valuation by Columbia Financial, the JCN board saw no reason for Intrust to spend $125,000 on a second appraisal by Duff & Phelps. ¶ 143. Defendants argue that this was a statement of opinion that is not actionable. As plaintiff argues, however, the complaint alleges that defendants provided various reasons why indemnification was unnecessary, including the Columbia Financial valuation. Because plaintiff alleges that these reasons are false or misleading, plaintiff has stated an actionable claim.

 The letter stated that the request for indemnification by Duff & Phelps was "unprecedented." 144. Plaintiff alleges that this statement was false, but defendants argue that even if it was untrue, it was immaterial. The Court disagrees. As noted above, defendants were attempting to curry favor among ESOP shareholders by providing reasons why Intrust's request for a new appraisal was unnecessary. The Court cannot say that this misstatement was not substantially likely to influence JCN shareholders, because defendants were attempting to justify the Highwoods acquisition instead of higher offers for ESOP stock.

Based on the previous discussion, the Court grants defendants' motion to dismiss plaintiffs' third, fourth, and fifth claims in part. Plaintiff has not stated an actionable claim that (1) because the value of High-

woods stock dropped after the merger, the board fraudulently misrepresented that the Highwoods acquisition was in shareholders' best interests; (2) the board fraudulently omitted from the proxy its information that Duke/Simon was interested in pursuing a bid; (3) the proxy fraudulently represented that the board did not pursue a convertible preferred stock offering because it could not obtain the support of Intrust; (4) the board fraudulently omitted from the proxy its true motives behind the Highwoods acquisition; and (5) the letter of June 8 failed to disclose the fact that JCN stock had traded above $65 per share after the announcement of the merger. In all other respects, defendants' motion to dismiss plaintiff's third, fourth, and fifth claims is denied.

### D. "Public Offering" Under Sections 11 And 12 Of Securities Act of 1933

 Defendants argue that plaintiff's fourth and fifth claims must be dismissed because they require a "public offering" which is not present here. Plaintiff brings Count IV under Section 11 and Count V under Section 12(2) of the Securities Act of 1933 ("Securities Act"). See 15 U.S.C. §§ 77k; 77l. To have standing under Section 12, a plaintiff must allege a "public offering" of securities.[20] Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Section 12(2) bases liability on material misstatements or omissions in a prospectus. 15 U.S.C. § 77l(2). In Gustafson, the Supreme Court interpreted the term "prospectus" as used in Section 12 by turning to Section 10 of the Securities Act. Id. at 570, 115 S.Ct. 1061. The Court noted that Section 10 defines a prospectus as including the information contained in a registration statement. Id. Generally, only public offerings need be registered. The Court therefore limited Section 12(2) to cover only public offerings. Id. at

575–76, 115 S.Ct. 1061. In this case, if the proxy did not need to comply with the requirements of Section 10, defendants are not liable under Section 12(2). See Glamorgan Coal Corp. v. Ratner's Group PLC, 1995 WL 406167 at *3 (S.D.N.Y. July 10, 1995).

 For purposes of registration, defendant bears the burden of proving that the offering is not a public one and is therefore exempt from registration. Securities and Exchange Comm'n v. Ralston Purina Co., 346 U.S. 119, 123, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); United States v. Arutunoff, 1 F.3d 1112, 1118 (10th Cir. 1993). Here, defendants argue that they cannot be liable under Section 12 because the acquisition was not a public offering. After Gustafson, this argument requires inquiry whether registration was required for the offering. See Gustafson at 569, 115 S.Ct. 1061. Defendants therefore bear the burden of showing that the offering did not need to be registered. See Fisk v. Super-Annuities, Inc., 927 F.Supp. 718, 730 (S.D.N.Y.1996). Other than to allege that the offer was not public because it was directed solely at JCN shareholders, defendants do nothing to satisfy this burden.

 It is clear that "to be public, an offer need not be open to the whole world." Ralston Purina, 346 U.S. at 123, 73 S.Ct. 981. Therefore, this fact alone does not establish that defendants are entitled to dismissal. "An offering is considered private only if limited to investors who have no need for the protection provided by registration." Arutunoff, 1 F.3d at 1118. To determine if an offering is sufficiently limited, the Court must make a fact-intensive inquiry into such factors as (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering. Id.

---

**20.** Defendants also argue that plaintiff must allege a public offering to bring an action under Section 11. The discussion whether plaintiff alleges a public offering is therefore applicable to plaintiff's Section 11 claim.

This inquiry is not well suited for a motion to dismiss. Therefore the Court can only presently determine whether plaintiff's allegations, if true, are sufficient to show a public offering. *ESI Montgomery County, Inc. v. Montenay Int'l Corp.*, 899 F.Supp. 1061, 1065 (S.D.N.Y.1995).

Plaintiff's allegations are sufficient to survive defendants' motion to dismiss. First, plaintiff alleges that the JCN proxy constituted a prospectus for purposes of Section 12(2). Second, plaintiff alleges that the proxy served as a registration statement. Third, plaintiff alleges that Highwoods filed a registration statement regarding the acquisition. Defendants do not cite any allegations in the complaint which conclusively establish that the offering was merely private and did not need to be registered. Assuming plaintiff's allegations to be true, the acquisition was a public offering under the analysis of Gustafson.[21] Plaintiff has sufficiently alleged a public offering. *See ESI*, 899 F.Supp. at 1065; *Fisk*, 927 F.Supp. at 730–31. Defendants are therefore not entitled to dismissal of plaintiff's Section 11 and Section 12(2) claims.

### E. "Control Person" Liability Under Sections 15 And 20

In Count VI, plaintiff alleges that the individual defendants are jointly and severally liable under Section 15 of the Securities Act and Section 20 of the Securities Exchange Act of 1934 because the individual defendants acted as "control persons" over the acts which form the basis for plaintiff's claims. *See* 15 U.S.C. §§ 77o, 78t. Defendants seek dismissal of this claim because plaintiff must set forth a primary violation of federal securities law. Defendants argue that because they are entitled to dismissal of plaintiff's claims under Counts III, IV and V, they are also entitled to dismissal of Count VI. As previously discussed, however, defendants are

not entitled of dismissal of Counts III, IV and V. Count VI therefore survives defendants' motion to dismiss.

**IT IS THEREFORE ORDERED** that defendants' *Motion For Reconsideration* (Doc. # 43) filed March 18, 1999 be and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that defendants' *Motion For Oral Argument* (Doc. # 44) filed March 23, 1999 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' *Motion To Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6)* (Doc. # 18) filed January 6, 1999 be and hereby is SUSTAINED in part and DENIED in part. The Court dismisses plaintiff claim for breach of fiduciary duty in Count I under *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985). The Court also dismisses Count II to the extent that it alleges a breach of fiduciary duty regarding the disposition of ERISA assets. The Court also dismisses Counts III, IV, and V to the extent that plaintiff alleges violations of federal securities law in that (1) because the value of Highwoods stock dropped after the merger, the board fraudulently misrepresented that the Highwoods acquisition was in shareholders' best interests; (2) the board fraudulently omitted from the proxy its information that Duke/Simon was interested in pursuing a bid; (3) the proxy fraudulently represented that the board did not pursue a convertible preferred stock offering because it could not obtain the support of Intrust; (4) the board fraudulently omitted from the proxy its true motives behind the Highwoods acquisition; and (5) the letter of June 8 failed to disclose the fact that JCN stock had traded above $65 per share after the announcement of the merger.

---

21. Simply because defendants filed registration statements does not establish that registration was required. Viewing the facts in the light most favorable to plaintiff, however, these registrations—especially when combined with plaintiff's allegation that the proxy was a prospectus—are evidence of a public offering.